## C. A. MYERS V. THE STATE.

### No. 3601. Decided June 16, 1915.

### Rehearing denied June 26, 1915.

**1.—Murder—Change of Venue—Discretion of Court.**

Where, upon trial of murder, the defendant filed his application for a change of venue on both statutory grounds, and the State filed a contest of the application, when the court heard the evidence adduced thereon, and the testimony was conflicting, but fully sustained the judgment of the court in refusing to change the venue, there was no reversible error, it not being shown that the trial judge abused his discretion.

**2.—Same—Jury and Jury Law—Death Penalty.**

Where, upon trial of murder, and a conviction thereof, assessing the death penalty, the record showed that the examination of one of the jurors disclosed that he would be unwilling to inflict the death penalty under any circumstances, there was no reversible error in excusing him.

**3.—Same—Jury and Jury Law—Death Penalty—Conscientious Scruples.**

Where, upon trial of murder, a juror on his voir dire stated that, if it were left to him, there were no cases in which he would inflict the death penalty, although he also stated that there might be cases in which he would agree to the death penalty, there was no error in excusing him.

**4.—Same—Jury and Jury Law—Opinion of Juror.**

Where the record showed on appeal that the juror had heard people talking about the case since he had been summoned on the venire, and while in attendance upon the court on several occasions, there was no error in excusing him.

**5.—Same—Jury and Jury Law—Challenge for Cause—Opinion of Juror.**

Where the juror, upon his examination by State's counsel, stated that he had a fixed opinion about the case, and that it would take pretty strong evidence to remove it, there was no error in sustaining a challenge for cause by the State, without calling on defendant to act on the challenge.

**6.—Same—Challenge for Cause—Jury and Jury Law—English Language.**

Where the juror appeared to understand the questions propounded to him by the attorneys, and gave intelligent answers in the English language, he was not disqualified on the ground that there were some words in the English language of which he might not understand the meaning.

**7.—Same—Jury and Jury Law—Defective Hearing.**

Where the juror could hear the questions propounded to him, apparently without difficulty, and that he had no opinion as to the guilt or innocence of the defendant, although he had read newspaper reports of the homicide, he was, nevertheless, a qualified juror.

**8.—Same—Jury and Jury Law—Opinion.**

Where the juror stated on his voir dire that he had heard some slight discussions of the case, but that he had no opinion upon it; that if the testimony developed the fact that a witness was in sympathy with the defendant, he would consider that fact in passing on his testimony, and would not give it as much weight as the testimony of a witness who had no interest in the case, he was a qualified juror.

**9.—Same—Jury and Jury Law—Opinion.**

Where the juror stated on his voir dire that while he had read newspaper reports of the homicide, that he had never heard the case discussed by

anyone, or expressed an opinion, and that while he had a casual impression from what he read in the papers, that this would not influence him in finding a verdict according to the law and the evidence, he was a qualified juror.

### 10.—Same—Jury and Jury Law—Rule Stated.

Where some of the jurors stated on their voir dire that they had read the newspaper reports of the homicide, but had no such opinion as would influence their verdict, and who did not serve on the jury, there was no reversible error, it not being shown that an objectionable juror was forced upon the defendant. Following Grissom v. State, 8 Texas Crim. App., 386, and other cases.

### 11.—Same—Rule Stated—Practice on Appeal.

The inquiry in the appellate court is, not whether the court may have technically erred in passing upon the qualification of a juror, but, did the action of the court in so doing tend to defeat the constitutional right of a fair and impartial jury; if not, there is no reversible error.

### 12.—Same—Continuance—Practice on Appeal—Mental Condition.

The overruling of an application for continuance must be viewed in the light of the evidence had on the trial, and the evidence had on the hearing of the motion for a new trial, and where the alleged absent testimony with reference to the sanity of the defendant, related to a condition of his mind some six years before the commission of the homicide, and it was not shown that the absent witnesses had opportunity to observe defendant's mental condition in the time intervening, and defendant's sanity at the time of the homicide was clearly established by the evidence, there was no error in overruling the motion for continuance.

### 13.—Same—Sufficiency of the Evidence.

Where, upon trial of murder, and a conviction assessing the death penalty, the evidence amply supported the verdict of the jury, there was no reversible error.

### 14.—Same—Attorney and Client.

See opinion complimenting the attorneys of the defendant, who were appointed by the court, for their faithful and able defense of their client.

Appeal from the District Court of Tarrant. Tried below before the Hon. Jas. W. Swayne.

Appeal from a conviction of murder; penalty, death.

The opinion states the case.

*A. J. Power* and *Walter A. Nelson,* attorneys for appellant.—On question of change of venue: Sorrel v. State, 74 Texas Crim. Rep., —, 169 S. W. Rep., 299; Streight v. State, 62 Texas Crim. Rep., 453, 138 S. W. Rep., 742; Coffman v. State, 62 Texas Crim. Rep., 88, 136 S. W. Rep., 779; Dobbs v. State, 103 S. W. Rep., 918; Barnes v. State, 59 S. W. Rep., 882.

On question of continuance and mental condition of defendant: Roberts v. State, 150 S. W. Rep., 627; Wade v. State, 75 Texas Crim. Rep., 572, 172 S. W. Rep., 215; Medford v. State, 174 S. W. Rep., 607; Baxter v. State, 150 S. W. Rep., 912; Valigura v. State, 150 S. W. Rep., 778.

On question of conscientious scruples to inflict death penalty and

examination of jurors on their voir dire: Garcia v. State, 12 Texas Crim. App., 335.

*C. C. McDonald,* Assistant Attorney General, and *Marshall Spoonts,* County Attorney, for the State.—On question of change of venue: Baw v. State, 24 S. W. Rep., 293.

On question of continuance and mental condition of defendant: Duck v. State, 45 S. W. Rep., 802; Morrison v. State, 51 S. W. Rep., 358.

On question of conscientious scruples to inflict death penalty: Thompson v. State, 19 Texas Crim. App., 593; Kennedy v. State, 19 id., 618, and cases cited in opinion.

HARPER, JUDGE.—When tried appellant was adjudged guilty of murder and his punishment assessed at death. From this judgment he prosecutes an appeal to this court.

The first question presented is, the court erred in overruling appellant's application for a change of venue. Appellant based his application on both statutory grounds. The State filed a contest of the application, when the court heard the evidence adduced thereon. It may be said that there was no evidence tending to show that there was a dangerous combination against appellant, instigated by influential persons. There is nothing to suggest that anybody had combined, further than to show that the officers of the county had promptly arrested appellant, grand jury reconvened, and the cause set for hearing five days after the service of copy of indictment on him. That these officials acted promptly in what they considered the performance of their duty, is not a combination of influential persons within the meaning of the statute. On the other statutory ground, "that there is so great a prejudice against appellant in Tarrant County he can not obtain a fair and impartial trial," appellant did introduce some evidence tending to support that allegation.

He first called J. Ralph Griffin, circulation manager of the Fort Worth Record, and Harold Huff, circulation manager of the Star-Telegram. These gentlemen testified as to the circulation of each of these papers in Fort Worth and Tarrant County, and by them was proven up the articles published in these papers on January 20th, 21st, 22nd, and 23rd, 1915, and on October 30, 1914, the latter publication relating to the remarks and conduct of Judge Swayne when the jury acquitted M. M. Hayes, charged with killing R. E. Boswell. It was contended that these remarks of Judge Swayne would have some influence by reason of the fact that Mr. Montague, whom appellant was charged with killing, had succeeded Mr. Boswell as superintendent of the terminals of the Texas & Pacific Railway Company, and that the evidence for the State in the Hayes case tended to show that he had killed Boswell because he had discharged him, and that the evidence for the State in this case would also tend to show that appellant killed Montague because he had discharged him. Neither Mr.

Griffin nor Mr. Huff were asked any questions as regards the state of feeling against appellant in Tarrant County, nor was their opinion elicited as to whether they thought appellant could receive a fair and impartial trial,—they being introduced merely to prove up the publication of the articles included in the Record and Star-Telegram.

Wm. A. Bowen, publisher of the Arlington Journal, was introduced to prove up the article published in his paper. No questions were propounded to him tending to prove his opinion as to whether or not there was any prejudice against appellant in Tarrant County.

Ray H. McKinley, publisher of the Daily Live Stock Reporter, was introduced to prove up an article in his publications of date January 20th and 24th. He was asked no questions relative to the state of the public mind.

J. Lewis, publisher of the Keller Journal, testified as to the article published in his paper, and the circulation of his paper. He also testified that there had been considerable discussion relative to this killing in Keller, and the expressions of opinion were all unfavorable to appellant. He is the only one of the newspaper men interrogated in regard to that matter, and he was not asked to give his opinion as to whether or not there was· so great a prejudice against appellant in Tarrant County as would prevent him being given a fair and impartial trial. We have read all the articles included in the transcript and they are in the main recitations of the facts attendant upon the homicide, although in some instances expressions of opinion are given; especially is this true as to the remarks of Judge Swayne at the time of the acquittal of Hayes, and the remarks of Judge Brown in reconvening the grand jury to investigate this homicide. We are aware that at one time in the judicial history of this State it was held that the reading of such articles, and the fact that some impression was made on the mind of the person reading the articles, was held to disqualify a person as a juror. By reason that such had been declared to be the law, our Legislature, in section 13 of article 692, enacted that. although a juror may have received an impression, or formed an opinion, from reading newspaper accounts of the homicide, communications, statements, or reports, or mere rumor or hearsay, if he on oath shall state that such impression or opinion so formed is so slight that it will not influence his action, and that he will be able, notwithstanding such impression or opinion, to render a fair and impartial verdict, the reading of such articles and the hearing of such reports or statements will not disqualify him as a juror. Since the adoption of that article of the Code, a person seeking a change of venue must not only show that such publications were made, but must go further and show by competent evidence that by reason of such publications, statements or reports there has been created in the public mind so great a prejudice as will prevent him receiving a fair and impartial trial in the county. Now, in addition to proving up these publications, appellant called several witnesses, Stanley Boykin, an attorney residing in the City of Fort Worth, after reciting the incidents leading him to form his opinion, testified that

he was of the opinion there was so great a prejudice in Tarrant County against appellant that he could not receive a fair and impartial trial. On cross-examination he stated he had not been outside of the City of Fort Worth since the homicide, and his opinion had been formed from talking with a number of citizens in Fort Worth. That he had talked to no one residing outside the limits of the city.

Dr. J. N. McKnight testified that there were something over twenty thousand qualified jurors in the county, and that if they had all read the papers it would be possible, but in his opinion improbable in the ordinary way to get a jury who had not formed an opinion. He resided in Fort Worth, and most of the people with whom he had talked about the murder had expressed an opinion that appellant ought to receive a death sentence.

Mr. C. R. Kinchen testified he was a lawyer residing in Fort Worth, and after giving the reason for his opinion, stated it was his opinion that appellant could not get a fair and impartial trial in Tarrant County at this time. He stated he had not heard a great many express an opinion, and in giving the opinion he did he was presuming that the papers had been read by the qualified jurors in the county. That he had talked to no one from Arlington, Grapevine, Handley, Everman, Keller, Mansfield or any other place in Tarrant County outside of the City of Fort Worth.

B. H. Gibson testified he was a lawyer; that he had lived in Fort Worth fifteen years. He stated the reason why he had formed the opinion he held, and said: "I do not think it possible at this time to secure a fair and impartial jury to try the case in Tarrant County." On cross-examination he admitted he was a member of the Socialist organization in Fort Worth, and that the Socialist organization, at a meeting where there were between thirty and seventy-five present, had passed a resolution requesting him and Mr. Edgar E. Johnson to tender their services to appellant. He further stated that the Socialists are opposed to capital punishment, and do not believe in the theory of capital punishment. That a discussion relative to this case was held at a meeting of the Socialist organization at the time the resolution was passed. And here we might say that after this testimony was adduced, there was no error in the court permitting counsel to ask the various jurors if they were members of that Socialist organization.

On the question of whether or not a mob had been formed to do appellant injury, appellant called J. L. Reynolds, who testified he was jailer, and that on the night of the homicide, January 20th, he was on duty. That he heard certain rumors and telephoned to the sheriff, and they thought it best to carry appellant to Dallas, and he was carried there that night, but was brought back in a day or two, and had been in the Tarrant County jail since. In regard to people coming to the jail that night after appellant left, he said: "I was on duty when a committee of five came up there to see if he was in the jail, but there was no mob. I do not remember the names of the committee, one was Mr. Bomen, I think, a fellow down at the T. & P. They said they

wanted to talk the matter over with him, but I did not talk much with them. I carried them over the jail after Mr. Myers had left. I suppose they wanted to see him. I did not feel any danger, just turned them in. I don't know whether there was a mob out in front. Just these five men came in and they did not make any statements to me. I did not hear any conversation on the outside of the jail. If there was a mob out in front I did not see them."

These are the witnesses called by appellant, whose testimony tended to show that a prejudice existed in Tarrant County against appellant. The State called but few witnesses in rebuttal. Sheriff Mann testified: "I should judge there are 25,000 qualified jurors in Tarrant County. I think this defendant can secure a fair trial in this county. I think about forty per cent of the jurors live in the county and sixty per cent in town."

J. L. Reynolds testified he had lived in Tarrant County seventeen years, and was well acquainted with the citizens in the county, and he was of the opinion that appellant could receive a fair and impartial trial.

R. M. Davis testified he was police commissioner of Fort Worth; that he was over the city a great deal, and from the discussion he heard he was of the opinion appellant could get a fair and impartial trial.

J. W. Taylor testified he was in the real estate business in the City of Fort Worth, and was of the opinion that appellant could get a fair and impartial trial in Tarrant County. He knew of no prejudice against him, and had heard but little discussion of the question.

Brown Harwood testified he was in the real estate business in Fort Worth; that he had heard this homicide discussed, but he had heard nothing that would lead him to believe a prejudice existed against appellant, and he was of the opinion that appellant could get a fair and impartial trial in Tarrant County.

G. W. Fincher, a contractor and builder, residing in the City of Fort Worth, testified that he was about town a great deal, and he did not think there was any strong feeling against appellant. That he himself had formed no opinion on the merits of the case, and was of the opinion that appellant could get a fair trial in Tarrant County. That he had heard some expressions both in favor and against appellant, but very few of either character.

C. F. Allen testified that he was of the opinion that appellant could get a fair trial in Tarrant County. That if the names of two hundred men were drawn from the jury wheel a jury could be secured of fair and impartial men who had no opinion in the case.

George W. Bell testified he was formerly tax assessor of Tarrant County; that he was well acquainted with the citizenship of Tarrant County, and in his opinion there were at least 3000 qualified jurors in the county outside of the City of Fort Worth who had never heard of the case, or that there was such a case. He thought appellant could receive a fair and impartial trial in the county.

As appellant had introduced a newspaper excerpt published in the Arlington paper, the State called W. B. Collins of Arlington, who tes-

tified that there was not so much discussion of this homicide as in other instances, and he was of the opinion that appellant could get a fair trial in Tarrant County.

The State had had summoned some twelve or more other witnesses and tendered them to appellant, but said it would not call them unless desired by appellant. Appellant's counsel stated he would not call them unless given an opportunity to consult them. Time to do so was then tendered him, but neither side called the witnesses.

It is thus seen that no witnesses were called to testify residing outside of the City of Fort Worth as to any state of feeling or to any prejudice existing against appellant in the territory outside of the City of Fort Worth. It was further shown there were 10,000 qualified jurors in Tarrant County residing outside of the City of Fort Worth, and no one testified for appellant that any portion of those 10,000 jurors would not be qualified. On the other hand, the State introduced evidence that there was no such state of feeling as would render such jurors incompetent, and outside of Dallas County, no adjoining county would have hardly an excess of 10,000 qualified jurors. As to the condition in the City of Fort Worth, some half dozen worthy citizens are of the opinion that prejudice existed among the citizenship of that city; while an equal number of credible citizens entertained the contrary view. This is a question addressed to the sound discretion of the trial court, and no such showing is made by the testimony offered as would authorize us to hold that the trial court abused his discretion in the premises. There are some twenty or thirty other towns and postoffices in Tarrant County, outside of the City of Fort Worth, and no one is called to show that there had been such discussion of this case, or familiarity with the facts, as would render the citizenship unfit to serve as jurors in the case. In considering this record, we necessarily read not only the evidence included in the bill, but also each and every one of the bills reserved to the action of the court in passing on challenges to the jurors while counsel were selecting the jury,—apparently the full examination of the various jurors being inserted in the record.

The record shows that while John Fisher was being examined he stated in answer to the question, "If a cold-blooded murder should be shown by the evidence to have been perpetrated, and the crime under the evidence justified and authorized the infliction of the death penalty, and he, under the charge of the court, was given the option of assessing the death penalty or assessing confinement in the penitentiary, would he agree to the death penalty," to which question he answered "No." The court excused the juror, to which action appellant reserved an exception. We do not think there was any error in the ruling of the court, because the examination of the juror shows that he would be unwilling to inflict the death penalty under any circumstances.

Juror Bryant, in answer to the question if he had any conscientious scruples against the infliction of death as a punishment for crime, answered, "Some, yes, sir." He was further examined and finally stated, "I do not believe my conscience would let me give the death

penalty." He then stated there might be cases in which he would agree to the death penalty, but if left to him there were no cases in which he would inflict the death penalty, but would give life imprisonment   Taking this juror's examination as a whole, we do not think the court erred in excusing the juror.

Another juror, J. A. J. Davis, was excused by the court because the evidence showed that he had heard people talking about the case since being summoned on the venire and while in attendance on court on several occasions.   There was no error in the court so doing.

Frank Shepherd testified from what he had heard said and what he had read about the case, "I have a fixed opinion about this case, and as to whether the defendant should be punished.   That it would take pretty strong evidence to remove such opinion."   There was no error in sustaining a challenge to this juror.   These were the exceptions and instances where the court excused the jurors without appellant being called on to act on them, and none of them present error.

In several bills appellant complains that the court erred in refusing to sustain challenges to the following named jurors: R. Metzner, H. K. Whitworth, T. B. Mason, H. R. Pool, D. F. Eggleston, and J. W. Skaines.   The juror Metzner answered he had no opinion as to the guilt or innocence of the appellant, but said he was a naturalized German-American citizen, and there were some words in the English language he might not understand the meaning of.   The juror appeared to understand the questions propounded to him by the attorneys and gave intelligent answers, and if we were to hold as disqualified all citizens who do not understand the meaning of all words in the English language, the list of men qualified to serve on the juries in this State would be quite limited.

Appellant challenged Eggleston on the ground that he answered that his hearing was defective—he could hear well out of one ear, but in the other his hearing was defective.   The juror could hear the questions propounded apparently without difficulty, and the court in overruling the challenge on this ground stated he would so place the juror that he could hear everything.   Appellant also objected to the juror because his answers showed that he had read the papers containing the report of this homicide.   He stated that from reading these reports and from no other source did he have any opinion as to the guilt or innocence of the defendant.

Mr. Pool answered he had read none of the reports of this homicide—had read nothing about it, and knew nothing about it.   He had heard some slight discussion but formed no opinion in the premises.   The juror further answered that if the testimony developed the fact a witness was in sympathy with defendant he would consider that fact in passing on his testimony, and he would not give it as much weight as one who had no interest in the case.   This the law says he should do—take these matters into consideration in passing on the weight to be given the testimony.

The other three jurors objected to—H. K. Whitworth, T. B. Mason

and J. W. Skaines—all testified they had read reports of the homicide, but also testified they had no such opinion as would influence their action in passing on the guilt or innocence of appellant. None of the jurors named in the bills of exception, and above referred to, served on the jury other than the juror J. W. Skaines. It has been well settled in this State that if the court should commit error in ruling on challenges to jurors, it would not necessitate a reversal of the case unless an objectionable juror was forced on appellant and had served as a juror in the case. Grissom v. State, 8 Texas Crim. App., 386; Wilson v. State, 32 Texas Crim. Rep., 22, and cases cited in sec. 756, White's Ann. Proc. The rule is stated to be that the inquiry in the appellate court is, not whether the court may have technically erred in passing upon the qualification of a juror, but did the action of the court in so doing tend to defeat the constitutional right of a fair and impartial jury. If the defendant has been tried by an impartial jury, the court may have committed errors in the mere process of empaneling the jury without subjecting its action to revision. So it might be said, the sole question here is, did the court err in refusing to sustain the challenge for cause as to the juror Skaines? This juror said he knew nothing about the case, but what he read in the newspapers. That this would not affect him as a juror, as he could and would lay it aside and not consider what he had read in passing on the case. On cross-examination he said all he read was the report contained in the Star-Telegram; he had read no other paper. That he had never heard any remarks about the case, and had never expressed an opinion about the case. That while he had no fixed opinion he might be said to have a casual impression from what he read in the papers, that this would not influence him nor have any weight with him, but if taken as a juror he would go entirely according to the evidence in the case, and the charge of the court. Mr. Skaines was a qualified juror, and the court did not err in so holding.

The only bill of exceptions in the record relating to any matter other than the overruling of the motion to change the venue and the qualification of jurors, relates to the action of the court in overruling his application for a continuance. This must be viewed in the light of the evidence had on the trial, and the evidence heard on the hearing of the motion for a new trial. He stated he desired a continuance to secure the testimony of Mrs. Katherine Myers, his wife, who lives in Little Rock, Ark.; his stepson, John Hendricks, who lives in Little Rock, Ark.; his son-in-law, C. H. Cooper, and his stepdaughter, who lived in Los Angeles, California; his two brothers-in-law, Martin Armburst and John Armburst, both of whom live in Arkansas, one at Bierne and the other at Little Rock, and the testimony of his brother, John Myers, who resides in Detroit, Mich. The fact he states he expects to prove by these witnesses is, "that defendant drank to excess in the near past; that he is subject to spells of despondency, and is of a melancholy and brooding disposition, and at such times does not comprehend the full measure of his acts. That he does not contend that the proof will

show that, as used a common parlance, he was insane, but that he is a paranoiac." Appellant testified on the trial of this case, and by his own testimony he shows that he separated from his wife six years or more ago; and that he has not been intimately associated with any of these people since that time. A portion of them, his testimony would show he has not seen for fifteen years or more. The State introduced the testimony of some dozen or more witnesses who have known and associated with appellant for the two years immediately preceding this homicide.

R. A. Manners testified he had known appellant a couple of years, and worked with him a portion of that time. He always had plenty of common sense, and never did or said anything at any time to cause him to doubt his sanity. He thought he was perfectly sane.

J. L. Grisson testifies he saw him almost daily for one and one-half years immediately preceding this homicide, and never at any time did appellant show any peculiarity of conduct or manner. That appellant always conducted himself in a normal manner.

Denny Deems, W. H. Lighe, C. D. Huyge, J. F. Ingram, C. B. Craig and J. E. Hendrick all testify to association with appellant for a great length of time immediately preceding the homicide, and they all testify to his sanity. No witness testifies that during the two years or more appellant had lived in Fort Worth immediately preceding this homicide that he drank to excess; or that he had any spells of melancholy or despondency, or that he was of a brooding disposition. If, during the two years he had lived in Fort Worth, or during the six years since he lived with his wife, he had drunk to excess, or showed signs of despondency or of a melancholy disposition, some one of those with whom he associated in Fort Worth would know that fact. For if his relatives should testify that this was his condition six years ago, it would not avail him unless some witness could be found who would testify that this condition continued to exist and did exist at about the time of or immediately preceding this homicide, for he simply says in his application "that at such times when those conditions existed he did not comprehend the full measure of his acts." This being so, it would be necessary for him to show that such condition existed at the time of the homicide, or it could not avail him, and as he offers no witness familiar with his condition and habits in the past six years, the testimony as to condition six years prior to the time would be wholly immaterial. It is true that attached to his motion for a new trial is the affidavit of his wife. She says they parted nine years ago, instead of six years, as stated in appellant's application for a continuance. She says that the reason of their separation was that she came to the conclusion he was of unsound mind, and then details acts and conduct which led her to that belief. But she places all these nine years and more prior to this homicide. This affidavit is made after the death penalty had been assessed by the Tarrant County jury. If witnesses are to be believed, prior to the time the death penalty was assessed Mrs. Myers said appellant was not of unsound mind. George E. Hosey

testifies that since appellant has killed Montague he saw and talked
with Mrs. Myers; and that she told him in the presence of B. C.
Rotenberry and Mr. Montgomery that there was nothing wrong with
the mental condition of appellant; that she had married him fifteen
years ago, and had been separated from him nine years, and she had
quit him on account of his "meanness." She said there was nothing
wrong with his mind, and he was as sane as she was at the time she
was talking to Mr. Hosey. There are but a few days difference in the
statements of Mrs. Myers to Mr. Hosey and the other gentlemen named,
and the affidavit attached to the motion for a new trial. To show his
condition six years and more prior to the date of the homicide would
be too remote in time, unless there was some testimony tending to show
his mental condition other than that of sound, sane man within some
reasonably short period of time prior to the homicide. It is not what
his mental condition was six or more years ago, but the inquiry is, what
was his mental condition at the time of the homicide? The evidence of
his condition six or more years ago would be admissible on the issue
of what his condition was at the time of the homicide, if there were
any facts or circumstances introduced in evidence tending to show his
mental condition to be other than that of a sane man at the time of or
immediately preceding the homicide. But in this the record is woefully
lacking, and it is not suggested that such could have been or could now
be procured. Under such conditions the testimony of his relatives
named in the application would not be of so relevant character as would
authorize us to hold that the court erred in overruling his application
for a continuance. All those with whom he has associated and worked
in the last few years, who testify, say he is sane and manifested not
the slightest indications of unsoundness of mind. He testified on this
trial, and his recital of the facts as he understood them are logical and
connected, and clearly indicated he knew what he was testifying to
and testifying about. He recites events covering a great period of time,
and there is nothing in his testimony to indicate that he is lacking in
mental capacity, and under such circumstances it is not surprising that
the jury found him sane. Nor is it surprising in the light of his con-
fession that they should assess the death penalty. He said in his
confession:

"I am a married man. I have only one child, a boy by name of John.
My wife and son live at Little Rock. My wife and I are separated.
On the 27th day of last March I was working for the Texas & Pacific
in the capacity of a switchman in the yards and a car was derailed in
the house track and on the 2nd day of April following I was discharged.
My service letter read that I was responsible for an accident. The letter
was signed A. W. Montague.

"I went to work for the Katy after that and my application was sent
to the T. & P. for approval and turned down. This was on the 22nd
day of September. I then went to Kansas City and came back along
in December and then went to see Mr. Montague about putting me
back to work. He claimed to me that he did not turn the application

down. I know that he did, though, because the T. & P. was the only reference I gave the Katy.

"I have been to see him several times since then and each time he would tell me that he could not do anything for me.

"I met him yesterday morning out in the yards on Main Street and asked him again to put me back to work, and he told me I would never work for the T. & P. as long as he was superintendent of terminals. I walked off and said, 'All right.'

"Yesterday evening I made up my mind to kill him. I got to studying over the way he was treating me. I went to the Majestic yesterday afternoon and couldn't pay any attention to the show because I was thinking of it. I made up my mind that I would find him this morning and kill him, that is all there is to it.

"I left home at about 7 o'clock this morning and went to the depot to hunt him. I had the gun on me then. I met him at the foot of the stairs this morning and I said, 'Have you made up your mind to put me back to work?' and he said, 'No.' Montague went on up the stairs and I went on out on the street. I was afraid I would hit someone else if I shot him in the depot, so I did not shoot him there. I wanted to wait for a better chance to get a shot at him. I went on down in the yards and met four or five fellows and spoke to them. I met him at the lower end of the passenger sheds. He was coming toward me and was looking at me when I pulled the gun. He hollered and told me, 'Don't.' Then I fired and he fell. He squealed and hollered, 'Oh, my God,' after I shot him and after he fell.

"I never at any other time had any trouble with him. This is the only difficulty I had with him and is the only reason why I shot him.

"After I shot him I then went and gave myself up to a policeman."

R. A. Manners, J. W. Johnson, C. A. Simmons and others who witnessed the tragedy, testify in substance to the same state of facts attendant upon the homicide.

Myers (appellant) testified on the trial to being discharged the 2nd of April, 1914, on account of an accident occurring in the T. & P. yards at Fort Worth. He says:

"After I was discharged I was taken sick with rheumatism and did not look for anything to do for two or three months. At that time I had about $300. After about three months I commenced to look for something to do and roomed at the Globe Hotel all the time I was in Fort Worth. I saw Mr. Montague several times after I was discharged but never spoke to him until along in August last year. Then I met him in front of the Busy Bee restaurant and told him I was going to Kansas City, or Chicago, or St. Louis, or some place and try to get a job, and told him I was going to refer to him, and asked if he would recommend me, and he said I could refer to him and it would be all right. Then I stayed around town for a while and went to Kansas City and went to work for the Chicago & Alton as switchman. I worked for them fifteen days. To them I gave Mr. Montague as reference. I was taken out of service on account of my application not being

approved, or so I was told by the general yardmaster.  I had no trouble while there and my work was satisfactory.  I did not give anybody else as reference beside Mr. Montague.  Then in about two weeks I went to work for the C., B. & Q. Railroad as switchman.  I worked there twelve days and was then taken out of service for the same reason as the other place.  I was so told by the general yardmaster.  I gave no one but Mr. Montague as reference when I went to work there.  So far as I know my work was satisfactory, as I was not taken out of service for that cause and no complaint was made of it.  Then I came back to Fort Worth and saw Mr. Montague along the latter part of October or first of November on Main Street in front of the depot, and asked if he had turned down my reference and he said 'No.'  I told him I had gone to work for the Alton and Q. both and was discharged from both places on account of application not being approved, and I had given no reference but him.  I met him four or five days after that and asked if he would let me go to work for the T. & P. and he said he would not.  I next met him on the street about December 15th and asked him again to put me to work and told him I was out of money and had room rent and board and had to go to work some place, and he said he would not.  I next met him along about the 10th or 12th of January right in front of the roundhouse and asked him again if he would not put me back to work, and told him my circumstances, and he said he would not.  The next time I met him was the same morning I shot him.  I met him in the depot coming down the stairs from his office.  I asked him again to put me to work and he told me I could not work for the T. & P. as long as he was superintendent of terminals or any other road.  The next time I met him I walked up to him and told him I was going to kill him and shot him and he died afterwards.  The day before I shot him I went to the Majestic Theater and got to thinking about it and it worried my mind so I never slept that night.  My troubles worried me."

We are of the opinion no reversible error was committed on the trial of the case, but must compliment Messrs. A. J. Power and Walter A. Nelson for the able manner in which they have conducted the defense in this case.  Without fee or hope of reward, other than of a consciousness of a duty well performed, they have conducted the defense in this case in the hope of saving the life of their client, even going to the expense of attending this court and filing exhaustive briefs.  The facts in the case, however, were too apparent, the deed was too openly done, and the sole motive being shown that appellant became angry because deceased would not place him at work in the terminals at Fort Worth.

The judgment is affirmed.

*Affirmed.*

[Rehearing denied June 25, 1915.—Reporter.]