******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JEFFREY GOULD
(AC 35758)

Sheldon, Prescott and Schaller, Js.

*Argued September 19, 2014—officially released February 17, 2015*

(Appeal from Superior Court, judicial district of New Britain, Alander, J.)

*Glenn W. Falk*, assigned counsel, for the appellant (defendant).

*Tracy L. Denholtz*, certified legal intern, with whom were *Bruce R. Lockwood*, senior assistant state's attorney, and, on the brief, *Brian Preleski*, state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The principal issue in this appeal is whether the trial court properly disqualified a prospective juror, E.F.,[1] on the ground that he lacked sufficient proficiency in spoken English to serve as a juror. The defendant argues on appeal that the trial court, *Alander*, *J.*, imposed a more stringent English proficiency standard than is required under General Statutes § 51-217 (a) (3), improperly disqualifying E.F., a machinist, despite his ability to both speak and understand the English language. As a result of E.F.'s improper disqualification, the defendant claims that the fairness of his trial is called into doubt. We agree with the defendant that the trial court's excusal of E.F. from jury service on the basis of his purported inability to speak English lacks support in the record. The defendant has failed, however, to demonstrate that he suffered any actual prejudice as a result of E.F.'s excusal. Accordingly, we affirm the judgment of the trial court.

The following facts and procedural history are relevant to this appeal. The defendant, Jeffrey Gould, was arrested and charged with one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1) in connection with an incident that occurred on the evening of May 11, 2011. The defendant entered a plea of not guilty and elected a jury trial.

During the course of jury selection, E.F., who identified his ethnicity on his juror questionnaire as "Puerto Rican" and claimed to have attended college, was examined by the state and defense counsel for approximately twenty minutes. Because the defendant's claim centers on E.F.'s English language skills, we devote some attention to his voir dire examination:

"[The Prosecutor]: Good afternoon, [Mr. F.]. How are you?

"[E.F.]: Good.

"[The Prosecutor]: You work as a machinist?

"[E.F.]: Yes.

"[The Prosecutor]: And tell me a little bit about what you do as a machinist?

"[E.F.]: We making parts. The name of the company is . . . . It's all owned by employees completely. And then we make parts for the machine. The machine is a packing machine, and they go for all United States, and I think they may be going for international.

"[The Prosecutor]: And how long have you been there for?

"[E.F.]: Close to ten years—seven years in the union.

"[The Prosecutor]: And what do you like most about your job?

"[E.F.]: Being a machinist. I've been all around over there, you know, machines. They change me from one department to another when they need me.

"[The Prosecutor]: Okay, if you could have any job in the whole world, what do you think you'd want to do?

"[E.F.]: I stay with what I'm doing now, being a machinist, yeah.

"[The Prosecutor]: And if you—do you have any children?

"[E.F.]: Yes.

"[The Prosecutor]: How many kids do you have?

"[E.F.]: Two.

"[The Prosecutor]: How old?

"[E.F.]: Twenty-seven and eighteen.

"[The Prosecutor]: What do you think the most important values that you are passing on to them?

"[E.F.]: I think, be honest.

"[The Prosecutor]: Okay, and what do you like to do in your free time—any hobbies?

"[E.F.]: Yes, I was a surfer a long time ago. I cannot do it over here. I like animals, dogs, you know. I spend all my time with them."

Following these preliminary questions, the state questioned E.F. on the subject of his own prior experiences with the criminal justice system:

"[The Prosecutor]: Have you or anyone close to you ever been a victim of a crime?

"[E.F.]: Yes.

"[The Prosecutor]: Are you comfortable telling me a little bit about that?

"[E.F.]: Well, kind of—do you want to hear?

"[The Prosecutor]: If you're comfortable telling me, yeah, sure.

"[E.F.]: Oh, well, one time we are stopped by the police and they confused me by another person, and they, like, put something on me.

"[The Prosecutor]: A guy came and pulled something on you?

"[E.F.]: Yes, kind of like that.

"[The Prosecutor]: Okay, and what did he pull on you?

"[E.F.]: I think it was—there was after him one person, and because he cannot get to that person, so he get close to me and reached to my pocket without me knowing because I was sitting down. So, when the police came, that guy told me, hey, this guy put something on you. That's it."

During the course of the state's examination on the subject of E.F.'s prior criminal history, the trial judge interjected and questioned E.F. as follows:

"The Court: If I can just interrupt for a moment? Mr. [F.], English is not your first language, is it?

"[E.F.]: No.

"The Court: Do you have any difficulty understanding English?

"[E.F.]: No.

"The Court: No?

"[E.F.]: No, I understand very well.

"The Court: Okay, and you understood everything I said initially when I was talking to the audience out there when you were in the gallery; did you understand—

"[E.F.]: Most of it, yeah, most of it.

"The Court: It's the most of it part that I'm a little worried about, which is why I asked, and I apologize. It's important that you understand everything because I never know—we never know beforehand what's going to be the most important part of the trial. I mean, it's all important, so it's important that you understand everything that's said. Do you feel like you'll be able to understand everything that's said in the courtroom?

"[E.F.]: I think so.

"The Court: Okay, you don't anticipate any problems understanding what people are saying?

"[E.F.]: No, no, in fact I understand what's your point. I got a big accent.

"The Court: Okay.

"[E.F.]: That when I talk, I know sometimes they tell me—

"The Court: No, no, I understand—I just want to—whenever anybody talks to me in an accent, and it's not just Spanish, I often inquire whether they can understand English well enough to be a juror. So, you're comfortable doing that and that's fine.

"[E.F.]: Yes, yes."

A similar exchange took place during defense counsel's examination of E.F.:

"[Defense Counsel]: Okay. I know the judge touched on this a little bit, but is English your first language or not?

"[E.F.]: No, Spanish.

"[Defense Counsel]: But you understand everything I said?

"[E.F.]: Yes, of course."

Subsequent to defense counsel's examination, the state challenged E.F. for cause. The state argued that several of E.F.'s answers were "not actually responsive to the questions that were being asked." In addition, the state argued that E.F. did not provide full answers on the jury questionnaire with respect to his criminal record, suggesting that he either did not understand the questionnaire, which was printed in English, or that he had failed to fully disclose his criminal history. In the case of the latter, the state argued, he should be disqualified for "not fully noting the extent of what he had on the form."

The court responded, "[h]ere's the problem I have . . . . I don't think he can communicate with the other members of the jury. I had an extremely hard time understanding his answers. And while he may understand the language because he certainly said he did, I have real concerns about in a jury room whether he's going to be able to fully participate with the other members of the jury in their deliberations for a verdict because he's extremely difficult to understand. There were times, numerous times where I did not understand what he was saying, and I think it's related to English not being his first language."

Defense counsel objected to the state's challenge, citing as a basis for the objection, inter alia, E.F.'s college background and his stated assurance when asked about his English language skills that he understood English fully. On that score, defense counsel opined that E.F. was in the best position to offer an informed opinion as to whether he was able to communicate in English. With respect to E.F.'s voir dire examination, defense counsel pointed out that E.F. had responded to every question posed to him and seemed "completely functional." Defense counsel also stated for the record that he had understood everything that E.F. had said other than when he mumbled on occasion. The court replied, "[w]hich was often. . . . That's part of my point." Defense counsel pressed further, stating, "[b]ut that doesn't mean if you said, pardon me, you wouldn't be able to hear what he said." Thereafter, the court excused E.F. for cause on the basis of his "significant language barrier," which the court suggested would "prevent him from fully participating as a juror in this case."[2]

The defendant's case proceeded to trial, and the jury found him guilty as charged. The court rendered judgment accordingly, sentencing the defendant to a term of twelve years of incarceration with five years of special parole. The defendant appeals from that judgment.

I

The defendant argues that the Connecticut statute on the qualification of jurors, § 51-217, does not set a high bar. He contrasts our law, which requires only that

jurors be able to "speak and understand" English, with those of other jurisdictions, which impose additional reading and writing requirements to establish proficiency in English. The defendant argues that "overzealous enforcement" of § 51-217 (a) (3) is not only legally incorrect, but it tends to create a substantial barrier to jury service in our increasingly diverse society. The defendant further contends that the record does not show that E.F. failed to satisfy the English proficiency requirement set forth in § 51-217 (a) (3), but "only that he had more difficulty in speaking than someone for whom English is a first language," which he claims to be an improper basis for disqualification. We agree.

Our appellate courts have not previously addressed the English proficiency requirement under § 51-217 (a) (3), and therefore we begin our analysis by setting forth the elements of § 51-217 (a) (3) and considering its application in the jury selection process. Section 51-217 (a) sets forth the necessary qualifications of prospective jurors, providing, in relevant part, that "[a] person shall be disqualified to serve as a juror if such person . . . (3) is not able to speak and understand the English language . . . ."[3] Jurors must, of course, have the ability to speak and understand English, for that is the language in which American jury trials are conducted. Accordingly, we agree with our sister courts that have considered this issue that "[j]urors must have a reasonable knowledge of the language . . . to enable them to perform their duties . . . ." *State* v. *Ji*, 251 Kan. 3, 9, 832 P.2d 1176 (1992). Persons who serve on juries must have sufficient language skills to understand the proceedings and resolve the factual issues presented at trial. *United States* v. *Pineda*, 743 F.3d 213, 218 (7th Cir. 2014).

Nevertheless, the test of juror eligibility should not be so exacting as to deny citizens their civil right to serve on a jury. Jurors must be able to communicate in English, but it is not necessary that they understand every word in the English language. See *Myers* v. *State*, 77 Tex. Crim. 239, 246, 177 S.W. 1167 (1915) (disqualification of naturalized German-American citizen not necessary on ground that juror admitted he might not understand all English words). "[I]f we were to hold as disqualified all citizens who do not understand the meaning of all words in the English language, the list of [persons] qualified to serve on the juries in this State would be quite limited." Id.

In Connecticut, the voir dire process enables the parties to assess the qualifications of prospective jurors. General Statutes § 54-82f.[4] "The purpose of the voir dire examination [of prospective jurors] is twofold: first, to provide information upon which the trial court may decide which prospective jurors, if any, should be excused for cause; and second, to provide information to counsel which may aid them in the exercise of their

right to peremptory challenge." (Internal quotation marks omitted.) *State* v. *Patterson*, 230 Conn. 385, 391, 645 A.2d 535 (1994). For the purposes of determining whether prospective jurors are proficient in English, voir dire examination allows the parties, or in some cases, the court, to ask questions of them and evaluate their communication skills. See *Diaz* v. *State*, 743 A.2d 1166, 1170–72 (Del. 1999) (expanded voir dire questioning necessary to determine English proficiency of bilingual juror).

In making a determination as to a prospective juror's competence to serve, there are two sets of interests to consider. First, "the interests of the parties, namely, the defendant and the state; and [second] the interests of the prospective jurors." (Footnote omitted.) *State* v. *Patterson*, supra, 230 Conn. 392. On the one hand, every person seated as a juror must be legally qualified and well suited to serve based upon his demonstrated willingness and ability to give careful consideration to all of the evidence and to decide the issues presented with complete impartiality. On the other hand, the jury selection process must also honor the right of all qualified citizens to be considered for possible jury service, regardless of their sex, race, color, creed or national origin. "The jury system postulates a conscious duty of participation in the machinery of justice . . . . One of its greatest benefits is in the security it gives the people that they, as jurors actual or possible, being part of the judicial system of the country can prevent its arbitrary use or abuse." *Balzac* v. *Porto Rico*, 258 U.S. 298, 310, 42 S. Ct. 343, 66 L. Ed. 627 (1922); see also *Carter* v. *Jury Commission of Greene County*, 396 U.S. 320, 330, 90 S. Ct. 518, 24 L. Ed. 2d 549 (1970) ("[w]hether jury service be deemed a right, a privilege, or a duty, the State may no more extend it to some of its citizens and deny it to others on racial grounds than it may invidiously discriminate in the offering and withholding of the elective franchise").

Thus, the trial judge, charged with ruling on challenges for cause, "has significant responsibilities during the voir dire process of a criminal trial." *State* v. *Patterson*, supra, 230 Conn. 398. The manner in which the trial court carries out its responsibilities and exercises its discretion depends on the task and the information before it, as elicited by the parties, or if appropriate, by the court. See, e.g., *State* v. *Faust*, 237 Conn. 454, 462–63, 678 A.2d 910 (1996) (trial judge's ability to question prospective jurors facilitates its task of excluding from jury any person about whom it entertains doubts regarding impartiality); see also *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986) (trial judge has duty to conduct hearing to determine if purposeful discrimination has been established); *State* v. *Patterson*, supra, 399 (trial judge has responsibility of determining proper scope of questioning of venirepersons). To determine whether there is good

cause to disqualify a juror on account of his inability to speak and understand English, trial courts must be cognizant of the need to avoid prejudices, conscious and unconscious, that are associated with assessing the English language skills of nonnative speakers.[5] Accordingly, a prospective juror for whom English is a second language should not be disqualified from jury service based upon his imperfect ability to speak English; rather, there must be sufficient information before the court to support a determination that the prospective juror is functionally incapable of carrying out his responsibilities as a juror, which includes being able to follow the court's instructions and the proceedings, and to communicate with fellow jurors during deliberations in a common effort to reach a verdict.

In light of the foregoing principles, it is clear that although the trial court is vested with wide discretion as to the manner in which it supervises jury selection and rules on the issues that arise during that process; *State* v. *Esposito*, 223 Conn. 299, 310, 613 A.2d 242 (1992); it must exercise that discretion in such a manner as to ensure that the disqualification of any juror— and the resulting denial of that person's right to be considered for possible jury service, one of the great rights and responsibilities of all Americans—is not without good cause.

In the present case, the court, in stating its basis for E.F.'s disqualification, did not dispute his ability to understand English, but indicated that it was of the opinion that E.F. would not be able to communicate with other jurors.[6] On the basis of our careful review of the record, we cannot conclude that that determination was supported by the information elicited during the voir dire process. The voir dire transcript demonstrates that E.F. conversed in English at length and answered more than 100 questions posed to him over a period of twenty minutes.[7] Additionally, the follow-up questions that were asked of E.F. by the state and defense counsel were equally responsive to E.F.'s statements, which appears to show that he spoke clearly enough to be understood by both counsel. Finally, although not dispositive, it is telling that the court monitor understood E.F. well enough to produce a full transcript of everything he said on voir dire, with no omissions or ellipses for inaudible or incomprehensible utterances.[8] This result, together with E.F.'s prompt and appropriate responses to the clarifying questions that were asked, make it clear that E.F. spoke English well enough to make himself understood during jury deliberations.

We also find it significant that E.F. confirmed for the court and defense counsel that he did not have problems communicating in English.[9] As defense counsel noted in his objection to the state's challenge for cause, the prospective juror is surely in the best position to provide information and offer an opinion with respect to his own

communication skills. E.F.'s assurances with respect to his proficiency in English were fully consistent with the information he provided to the court and the parties.[10] In addition, E.F. was able to provide written responses in English on his jury questionnaire.

The state argues that there was a sufficient basis for the court's determination that E.F. was unable to communicate to the degree necessary to perform properly as a juror. In support of its argument, the state scours the record for examples of E.F.'s language deficiencies, citing, for example, his failure to understand the meaning of the term "prosecutor." Awareness of legal titles, however, is not a prerequisite for jury service. We find equally unconvincing the state's references to excerpted portions of E.F.'s voir dire testimony that, when read in context, do not support the court's finding of a language barrier.[11] Again, as discussed previously, if the prospective juror is able to converse in English, and he is able to respond to questions that are asked, his failure to use every word in its appropriate context is not a sufficient basis for disqualification. See *Myers* v. *State*, supra, 77 Tex. Crim. 239; cf. *Rodriguez* v. *Commissioner of Correction*, 57 Conn. App. 550, 554, 749 A.2d 657 (2000) (language proficiency of petitioner determined on basis of evidence overall).

In the present case, the court predicated E.F.'s disqualification solely on its own difficulty hearing and understanding E.F., and suggested that this difficulty was "related to English not being [E.F.'s] first language." In light of the statutory requirement, which provides only that the prospective juror be able to speak and understand English, we conclude that the court's stated inability to hear some of E.F.'s answers, on account of his mumbling or his accent, did not support the court's exercise of discretion in disqualifying E.F. because he was functionally incapable of serving as a juror under § 51-217 (a) (3). Moreover, in the particular case of a prospective juror, like E.F., who speaks with an accent, if his answers are not immediately understandable, he can simply be asked to explain or clarify his answer, as routinely happens in daily discourse between people of different social, cultural and linguistic backgrounds in our heterogeneous society. "With the large influx of persons of Hispanic origin [and persons of other diverse backgrounds], it can now be expected that many jury venires . . . will contain persons who do not use textbook English grammar." *Cook* v. *State*, 542 So. 2d 964, 970 (Fla. 1989).

In sum, the record does not establish a sufficient basis to disqualify E.F. on the ground that he was unable to "speak and understand the English language . . . ." General Statutes § 51-217 (a) (3). The court's inability to hear or understand some of E.F.'s answers was not a disqualifying reason to excuse him under § 51-217 (a) (3). Therefore, to excuse E.F. from jury service on that

basis constituted an abuse of the court's discretion.

## II

It remains, however, to be determined if the court's unjustified excusal of E.F. from the defendant's jury constituted a harmful error. To obtain a new trial on the basis of the trial court's erroneous excusal of a potential juror for cause, a defendant must prove that the court's action deprived him of a fair trial before an impartial jury. *State* v. *Connelly*, 46 Conn. App. 486, 500, 700 A.2d 694 (1997), cert. denied, 244 Conn. 907, 908, 713 A.2d 829, cert. denied, 525 U.S. 907, 119 S. Ct. 245, 142 L. Ed. 2d 201 (1998). On the basis of the record before us, we do not find that the defendant has satisfied that burden.

The defendant argues broadly that the trial court's overly strict enforcement of Connecticut's English language proficiency requirement will inevitably result in the wholesale exclusion from jury service of members of ethnic minorities for whom English is a second language. Such systematic exclusions, he claims, will predictably produce juries that are unfair because they fail to represent the entire community. In support of his argument, the defendant directs our attention to *Thiel* v. *Southern Pacific Co.*, 328 U.S. 217, 221, 66 S. Ct. 984, 90 L. Ed. 1181 (1946), in which the United States Supreme Court reversed a civil judgment on the basis that daily wage earners had been intentionally excluded from the jury lists. The defendant analogizes his case to *Thiel*, arguing that by enforcing the English language proficiency requirement in such a manner as to cause such exclusions, the court undermines the perception of fairness among members of the excluded groups that is necessary for the proper functioning of our criminal justice system. Urging this court to consider those negative impacts on the administration of justice as the most significant harms resulting from the trial court's method of enforcing the English language proficiency requirement with respect to E.F., the defendant seeks a new trial without offering any proof of the particular impact of E.F.'s excusal on the fairness and impartiality of his own jury.

There are two basic reasons why the defendant's broad claim of prejudice must be rejected. First, it ignores the established test for prejudice, as announced in *State* v. *Connelly*, supra, 46 Conn. App. 486, which focuses solely on the impact of the challenged exclusion on the fairness and impartiality of the defendant's own jury. Second, it presupposes without evidence that the court took the same flawed approach to enforcing the English language proficiency requirement it used with respect to E.F. when reviewing the qualifications of all other members of the defendant's jury panel. In the present case, however, unlike *Thiel*, there is no evidence of a systematic exclusion of a particular class of juror.[12] Had the court used the same approach to assess

the English language proficiency of other prospective jurors for whom English was a second language, then its cumulative rulings, if they broadly excluded such persons from jury service, could be evaluated for their resulting impact on the makeup and representative quality of the defendant's jury. No claim to that effect has been made here, however, nor is any such claim supported by the record before us. Therefore, the court's isolated ruling as to E.F. has not been shown to have caused or risked causing the sort of systemic prejudice of which the defendant here complains, any more than it has been shown to have compromised the defendant's right to a fair trial before an impartial jury.

For the foregoing reasons, although we find that the trial court abused its discretion by excusing E.F., we conclude that the defendant's conviction must be affirmed on the ground that the defendant has failed to prove that the challenged excusal deprived him of a fair trial before an impartial jury.

The judgment is affirmed.

In this opinion SCHALLER, J., concurred.

[1] We refer to the venireperson by his initials to protect his privacy. See *State* v. *Hodge*, 248 Conn. 207, 229 n.25, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999).

[2] The court did not rule on the state's still pending objection regarding E.F.'s alleged failure to provide certain answers on his juror questionnaire.

[3] By contrast, many other jurisdictions require that individuals be able to read, write, and understand the English language with a degree of proficiency sufficient to fill out a jury questionnaire form to serve as a juror. See, e.g., *Diaz* v. *State*, 743 A.2d 1166, 1171 (Del. 1999) ("all persons are qualified for jury service except those who . . . are unable to read, speak, and understand the English language" [internal quotation marks omitted]); *State* v. *Ji*, 251 Kan. 3, 8, 832 P.2d 1176 (1992) (jurors must be able to read and write English); *State* v. *Comeaux*, 252 La. 481, 486, 211 So. 2d 620 (1968) ("[t]he requirement that a person be able to read and write the English language to be qualified for jury service is a reasonable and nondiscriminatory regulation"); see also *United States* v. *Escobar-de Jesus*, 187 F.3d 148, 166 (1st Cir. 1999) (requirement "that jurors be able to speak the English language and be able to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form"), cert. denied, 528 U.S. 1176, 120 S. Ct. 1208, 145 L. Ed. 2d 1110 (2000).

[4] General Statutes § 54-82f provides in relevant part: "In any criminal action tried before a jury, either party shall have the right to examine, personally or by his counsel, each juror outside the presence of other prospective jurors as to his qualifications to sit as a juror in the action . . . ."

[5] Determining the comprehensibility of nonnative speakers is a "[determination that is] subjective and highly vulnerable to the sways of prejudice." B. Nguyen, "Accent Discrimination and the Test of Spoken English: A Call for an Objective Assessment of the Comprehensibility of Nonnative Speakers," 81 Cal. Rev. 1325, 1325 (1993).

[6] As noted previously in the discussion of the facts of this case, the court stated: "[W]hile he may understand the language because he certainly said he did, I have real concerns about in a jury room whether he's going to be able to fully participate with the other members of the jury in their deliberations for a verdict because he's extremely difficult to understand."

[7] During such questioning, E.F. made appropriate responses to questions posed by the state concerning his "impressions" and the "bottom line," and he also expressed himself in the vernacular, for example, stating at one point that some police officers do their job "by the book . . . ."

[8] The state argues that the voir dire transcript is not a good measure of E.F.'s language skills, contending that it does not reveal the degree of difficulty that the court reporter may have confronted in preparing the transcript. It is clear, however, that in each instance that this court has reviewed claims

relating to one's ability to comprehend trial proceedings, albeit in other contexts, we have relied exclusively on the transcript. See *State* v. *Joseph*, 150 Conn. App. 867, 872, 93 A.3d 1174 (trial transcript revealed defendant had "a conversational command of the English language" and an understanding of trial proceedings), cert. denied, 314 Conn. 927, 101 A.3d 272 (2014); *Rodriguez* v. *Commissioner of Correction*, 57 Conn. App. 550, 554, 749 A.2d 657 (2000) (trial court transcript reflected that petitioner had command of English sufficient to enable him to understand testimony against him and to assist his counsel in preparing to cross-examine witnesses).

[9] E.F. acknowledged both that English was not his first language and that he speaks with a "big accent."

[10] In his voir dire examination, E.F. indicated that he had been employed in Connecticut for approximately ten years.

[11] The state also directs our attention to E.F.'s personal history as further bases for his disqualification, and cites his answers addressing his attitude toward the police, his negative feelings toward defense attorneys, and the victimization of his sister in a prior unrelated assault. Although these issues surely call into question E.F.'s ability to serve impartially—an objection that was not made—the state's detailed inventory of E.F.'s personal history, as provided by him, only further undermines its argument that he was unable to communicate in English.

[12] By contrast, in *Thiel*, both the clerk of the court and the jury commissioner testified that they intentionally excluded from the jury lists all daily wage earners. In addition, it was shown that any prospective juror called into court who worked as a day laborer was excused from service on the basis of hardship. It was this "blanket exclusion of all daily wage earners" that was determined to have "undermine[d] and weaken[ed] the institution of jury trial." *Thiel* v. *Southern Pacific Co.*, supra, 328 U.S. 224.