30   119.
31   635
30   119
35   294

### George W. Lacy v. The State.

#### No. 7384.   Decided June 24.

1. **Practice—Change of Venue—Burden of Proof.**—When issue has been joined upon a defendant's application for a change of venue the burden rests upon him to prove the existence of the cause or causes alleged in his application.

2. **Same—Action of Trial Court not Revisable unless, etc.**—The granting or refusing an application for a change of venue rests in the sound discretion of the trial court, and will not be revised on appeal unless it should appear that such discretion has been abused.

3. **Same—Bill of Exceptions to Order on such Application.**—The order of the court granting or refusing a change of venue will not be revised upon appeal unless the facts upon which the same is based are presented in a bill of exceptions, prepared, signed, approved, and filed at the term of court at which such order was made. Documents attached to and made a part of the application for a change of venue, but not embraced in a bill of exceptions, will not be considered on appeal in passing upon the order of the trial court upon such application.

4. **Same—Dangerous Combination.**—One of the causes set forth in defendant's application for a change of venue is alleged to be that an association of persons sixty-

five in number, citizens of Burnet County, who held their meetings in secret, and who are members of a powerful and secret organization, passed resolutions in memory of the deceased which in their language was intended to convey and did convey to those who read them the conviction that such secret assembly had confidence in the virtue of deceased, said resolutions among other things stating that deceased "never uttered a word that the purest woman would blush to hear." These resolutions were attached to and made a part of the application for a change of venue, but were not embraced in the bill of exceptions reserved to the action of the court refusing said application. *Held:*

1.   The resolutions could not be considered.

2.   But if the resolutions had been incorporated in the bill of exceptions they do not show any cause for a change of venue.   It devolved upon the defendant to show that there existed a dangerous combination against him of influential persons, by reason of which he could not expect a fair trial.   This he failed to do.

5.   Insanity—Evidence—Charge of the Court.—See the statement of the case and the opinion for evidence which it is held did not present the issue of the insanity of the defendant at the time of the commission of the homicide, and therefore the trial court did not err in refusing to submit such issue to the jury.

APPEAL from the District Court of Burnet.     Tried below before Hon. W. A. Blackburn.

On the evening of June 4, 1890, in Burnet County, the defendant shot and killed J. R. Phillips.   The place of the homicide was near defendant's pasture fence.   The evidence makes it certain that the defendant laid in wait for the deceased and shot him without giving him any warning whatever.

The defense is shown by the testimony of defendant's wife, which is as follows:

I am the wife of the defendant.   J. R. Phillips married my sister. The last time I saw the defendant on the day of the killing, and before the killing, was about 3 p. m.   The defendant had come to Burnet on Monday to look after some work; went to Burnet on June 2, and came back home on Tuesday, June 3, about 9 o'clock at night.   He was sick when he came home.   I was sick and in trouble.   On Wednesday morning he asked me what was the matter.   I just said I was sick. Afterward I told him I was in trouble.   Phillips, on Tuesday week before the killing, at his house had told me that he had perjured himself on account of my boys, who he said had been unlawfully handling stock.   Phillips had told me at his house the week before the killing, same time above referred to, that if I would sacrifice myself to him he would be satisfied and keep quiet.   He had insisted that I meet him at the place down on the river where the wire fence was attached to two hackberries above the mouth of Anderson Branch.   He had been to our house the Wednesday before and spoke to me and asked why I had not met him according to promise.   He said that he had perjured himself for my boys, and if I did not yield to him he would blow on them, or make their acts public.   No one was in the house at this time.

My sons were plowing in the field 160 or 180 yards away. My 18 months old baby was in the house. My 11 year old daughter was about the house somewhere. I then promised to meet him the next Wednesday. On the day of the killing, and before the killing, I told my husband of my troubles. He then seemed nearly crazy. I told him of the place, and went part of the way and showed him. I had not told my husband before, for I thought if I did one of them would have to die. He was restless all day. I told him that the time of meeting was about 4 o'clock. Prior to the hour of meeting I went in the other direction with my children to where there were some haystacks.

For six or seven years Phillips had at times expressed great affection for me as a sister, and his love seemed pure until Thursday two weeks before the killing, at his own house. Only his family were at home at this time. Toward evening Mrs. John Hallford came in, also old Grandma Hallford. On that day he expressed his lust. Prior to this his expressions of love I did not approve, but he only talked of his . loving me; that he loved me more than any one on earth. He told me about my sons, and said that he would expose them if I did not yield to him. I told all this to the defendant, and prior to this they were good friends; had been partners in business, but were not then partners, in the granite mountain. Phillips had told me two or three years before that my boys had been unlawfully handling stock, and told me that he had perjured himself to shield them, and that he did it for my sake; then intimated he could no longer shield them unless I yielded. He made the first intimation at his own house as stated, on the gallery, when no others were present. The day I told defendant he was restless, would move about uneasily; never saw him act so before, and we had lived together a long time. Generally when at home he would read or play with the children; that day he was silent, did not read nor notice his children; at dinner he ate nothing but a mouthful or so.

Cross-examined: Phillips had been talking of his affection for me as a sister for six or seven years. His more violent expressions of love were probably for six months before the killing. I replied to his declarations of love, that he should love his wife more than any one else. He frequently spoke of loving me as a brother. After he became more ardent he did not repeat his declarations often. The first time was at my own house; no others were present. I can't say what I said to him in reply. He several times spoke of loving me better than any one else. They were made at my house, as I met him nowhere else. Two or three years ago he spoke to me of my boys being engaged in unlawfully handling stock. I did not tell them of it. I did urge upon them to do right. My oldest boy is 24 years old, the next 22 years old, the next 20, and the next 17. I never mentioned to the boys what had been said, but urged them to be careful to do no wrong. I never brought in the name of Phillips. I did not tell my husband what Phil-

lips had said about the boys. The first time he made indecent pro-
posals was at his house, on Thursday two weeks before the killing, on
his south gallery. His wife was in the house, and so was his daughter.
I think the children had gone to Mr. Hallford's. He was lying down
on a cot on the gallery near where I was standing. He said my sons
were doing bad, that he had protected them, and that unless I would
submit to his wishes he would blow on them. He asked me to meet
him at the hackberries at the mouth of Anderson Branch, on Wednes-
day evening following, at 4 o'clock. I told him that I would do it.
At this time his wife came out. I did not say a word to her about
what he had said to me, nor to any one else. I went home that even-
ing about 5 o'clock. My children were with me. I think Mrs. Mollie
Hallford was there when I left. I was never at Phillips' again. I did
not go to the place on Wednesday; he came to my house. My boys
were in the field plowing 100 or 150 yards off; were plowing by the or-
chard. I don't know if they saw him. At this time I suppose my
husband was at the granite rock; he was not at home. The only ones
about the house was my baby; my 11 year old daughter and 7 year old
boy were about the house somewhere. Phillips staid at the house but
a few minutes. He came on horseback. He said to me, "I thought
you were to come and meet me." I replied, "I don't see how I could."
Mr. Lacy, my husband, was at home on Sunday following, but I did
not tell him about it. Did not tell my sister, Mrs. Phillips, nor any
one else about it. [The statement was read from testimony on *habeas
corpus*, "there was no one about the house but my babe."] I did say
that. I was asked who was present. There was no one else in the
house but my babe; the boys were plowing in the field adjoining the
orchard; the other children were about the house somewhere. He was
on the porch. He staid but a little while and made no improper pro-
posals right then. He asked me to meet him at the place on the next
Wednesday. I saw my husband the Sunday following, and I told him
nothing about it. He left on Monday morning. He came home with
a sore hand. I did not tell him, nor did I tell him or my sons about
his talk about stock. I never saw Phillips after that Wednesday. My
husband left Monday and returned Tuesday night. We were not ex-
pecting him home till the Saturday following. Did not tell my hus-
band of my troubles that night. I told him the next morning near
noon. I then went down part of the way at his request to show him
the place of meeting. I had never been to the place, and I suppose
my husband knew where it was as well as I did from the description.
When we went down he had his shotgun with him. We went in about
100 yards of the place, north of Anderson's Branch. I went back to
the house. Mr. Lacy did not come back to the house with me, but he
got there nearly as soon as I did. I left him because I wanted to get
away. The gun my husband had when we went down was a double-

barrel shotgun. I got dinner after we came back. I and my little children ate dinner. Mr. Lacy ate but little; he was restless, walking about the house. After dinner he sat a while on the gallery. Don't think that he and I talked any on the way as we went toward the place before dinner. We went 500 or 600 yards from the house. I never saw the ravine near the place of the killing. Know nothing of it. The timber is thick about the place of the killing. I just told my husband that the place was where the fence was fastened to two trees. I went down with my husband before dinner because he asked me to go. Don't know why he wanted me to go. After dinner my husband was sitting on the porch with his children. I don't know how long he sat there. I did not see him leave, but I guess it was near 3 p. m. when last I saw him there. I did not see him when he left the house to go to the place of meeting. About 4 the children wanted to go to the haystack, and I went with them. Between 4 and 5 o'clock I heard two gun shots fired. I think it was one and a half hours from the time defendant left the house till I heard the shots. We were at the haystack when the shots were fired. I was lying down in the straw when the shots were fired, and we then went back to the house. My husband got back to the house about the time we did. He then hitched up his hack and we went to Mrs. Whitman's. My husband had told me that he would meet Phillips himself. I did not go to the haystack because I knew my husband was going to kill Phillips. I went because I was uneasy; wanted to get away from myself. When at my sister's (Mrs. Phillips) last before the killing I had to be cheerful as I could. I had not seen my sister for some time; besides, I did not wish her to suspect anything. J. R. Phillips was killed in Burnet County, Texas, June 4, 1890.

The following are the resolutions attached to the application for a change of venue, and referred to in the opinion:

"IN MEMORIAM.

"REPORT OF COMMITTEE ON RESOLUTIONS ON DEATH OF
BRO. J. R. PHILLIPS.

"BURNET, TEXAS, June 16, 1890.

"*To the Worshipful Master, Wardens, and Brethren of Valley Lodge No. 175, A. F. and A. M.:*

"BRETHREN—The Great Grand Master of the Universe having called our beloved brother J. R. Phillips from labor to rest, we sadly realize that in his death we have lost a true and loyal brother. And while it is not our province to pass judgment upon the guilt, innocence, or justification of the person accused of his death, it devolves upon us in defense of our deceased brother to say that in the many years of his life among us as a man, and subsequently as a Mason, his name has

been a synonym for honor and integrity, honesty and uprightness.   A
stranger to fear, yet tender of heart, he was a living illustration that

> "The bravest are the tenderest,
> The loving are the daring."

"Quiet and refined in his manners, never uttering an oath or a word
that the purest woman would blush to hear, he was a consistent mem-
ber of the church and a just and upright Mason.

"They say he fell.   It may have been.   Poor human nature is frail;
but we take him as we find him, and speak whereof we know.   The
leaves of his life are spread before us like an open book, and there we
find a pure and spotless life of honor and integrity—a character clean
and white as snow.

"Let the light of truth in upon his life's history until, like the silver
surface of some mountain lake sparkling under the rays of the mid-
summer sun, it returns flash for flash in its purity, and we find it as a
crusader's polished shield in the days of knight errantry, with no rust
or corruption, no stain of reproach, no dents of crime to mar its
splendor.   A type of ancient chivalry, a peer of Launcelot in the days
of his purity and innocence, he was a knight of the olden school, with-
out stain and without reproach.

"If he erred, let us with the mantle of charity cover the charge his
death has squared, and cherishing his memory, hope for a grand re-
union in the land of light and love.

"In further token of love and esteem for our departed brother, be it

"*Resolved,* That in his death we have lost a noble brother, and that
our sincere and heartfelt sympathy is tendered to his widow and or-
phans in their great bereavement, deploring their loss and ours; for he
was indeed a true Mason, not alone in forms and ceremonies, but deep
at heart.   And the hearts of all that knew him best turn warm at the
mention of his name.

"*Resolved,* That a copy of these resolutions be forwarded to his
family, and that the lodge be draped in mourning for thirty days.

"VALLEY LODGE ROOMS, BURNET, TEXAS."

*A. W. Terrell,* for appellant.

*R. H. Harrison,* Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Appellant was convicted of manslaughter
and his punishment assessed at three years confinement in the State
penitentiary.   A motion to change the venue was made by appellant,
based upon both grounds of the statute.   Code Crim. Proc., art. 578.

The facts alleged to support the theory of combination consist of
resolutions passed by a Masonic lodge situated in the town of Burnet,

of which lodge deceased was a member. The resolutions were commemorative of the many virtues of the deceased, and were published in a newspaper that was printed in Burnet, which paper had a circulation of about 900 subscribers. The lodge had a membership of sixtyfive. The resolutions were very laudatory of the virtues of the deceased. The appellant swears in his affidavit that "he can not know certainly the extent or influence of said resolutions and can not foresee their effect, but he does believe that since their publication a prejudice has been expressed against him by very many men which did not exist before." His compurgators are Samuel W. Tate, John C. Tate, J. H. Andrews, and J. P. Nobles.

The State controverted the application, which was in proper and legal form as required by the statute. Willson's Crim. Stats., secs. 2209, 2210. It is shown thereby that Samuel W. Tate is the father-in-law of appellant and was the father-in-law of deceased also; that John C. Tate is the brother-in-law of appellant; that J. H. Andrews is related by marriage to appellant, and the son of appellant married the daughter of J. P. Nobles.

The counter-affidavit also attacks the means of knowledge of these compurgators by showing that their residence in the county and acquaintance with the citizens thereof are not such as to qualify them to speak in the matters whereof they depose.

We here reproduce all the evidence set out in the bill of exceptions bearing on the resolutions of the Masonic lodge and adduced on the trial of the issues involved in the motion to change the venue:

William M. Spittler testified that the Burnet Bulletin was circulated in every postoffice in the county. I saw the resolutions set out in the application when published in the Burnet Bulletin.

R. M. Smith: The circulation of the Burnet Bulletin was about 800, and went to every postoffice in the county.

William M. Spittler, recalled and cross-examined: The resolutions were not published by order of the lodge. It is a custom to pass resolutions upon the death of a member. If there is any combination in the lodge I don't know of it. This lodge was organized in 1854. A committee prepared the resolutions. The lodge did not order the publication. Don't know who wrote them. Resolutions generally are published.

Re-examined: Three copies of the resolutions like those set out in the application were made. One was sent to Mrs. Phillips by mail. It never reached her, and a second copy was prepared and sent to her by hand. I have the third copy. The second copy was sent by hand two or three weeks before they were published.

J. A. Stevens: I was publisher of the Burnet Bulletin at the time the resolutions in the application for change of venue were published. The circulation was 900 in the county. J. T. Halford brought me the

resolutions. This is the man who made the controverting affidavit. I think the defendant could get a fair trial in the county.

The only evidence contained in the bill of exceptions with reference to the relation of the Masonic lodge to the combination against the defendant was that of Spittler, and he testified that he knew of no such combination. The resolutions were not offered in evidence in support of the issues involved in the application to change the venue, nor does it form any part of the statement of facts embodied in the bill of exceptions reserved to overruling the motion. When the issue has been joined the burden of proving the existence of the cause or causes for the removal of the case on change of venue is upon the defendant. Davis v. The State, 19 Texas Ct. App., 222; Carr v. The State, 19 Texas Ct. App., 635; Pierson v. The State, 21 Texas Ct. App., 14.

None of the witnesses produced testified that appellant could not get a fair trial in the county, nor did any of them testify as to the alleged combination against defendant.

In most of the cases found in our reports, when the change of venue was refused the order refusing same was predicated upon a conflict of evidence as to whether the cause did or did not exist; but in this case the order refusing to change the venue was predicated upon evidence showing that the ground did not exist for such a change. The resolutions were not adduced in evidence on the trial of the issues raised by the motion and the contest thereto, and are not embodied in the bill of exceptions as evidence. Therefore the said resolutions can not be considered by us. Our statute provides that "the order of the judge granting or refusing a change of venue shall not be revised upon appeal unless the facts upon which the same was based are presented in a bill of exceptions, prepared, signed, approved, and filed at the term of the court at which such order was made. Code Crim. Proc., art. 584; Bowden v. The State, 12 Texas Ct. App., 246; Blackwell v. The State, 29 Texas Ct. App., 198.

The fact that the resolutions are attached to and form a part of the motion itself does not authorize this court to consider it as evidence adduced in support of the motion. But if the resolutions had been incorporated in the bill of exceptions as evidence, we would still be of the opinion that the court did not err in overruling the motion. We do not understand that resolutions passed by secret societies simply and only commemorative of the virtues of their deceased members are necessarily indicative of combinations formed against parties charged with crime as a means of preventing them from obtaining a fair trial in the courts of the country.

It was proved to have been the custom of the Masonic lodge to pass such resolutions and publish them, but in this instance the lodge did not publish the resolutions. To meet the statutory requirement the defendant should have shown that there was a dangerous combination

against him, instigated by influential persons, by reason of which he could not expect a fair trial. Code Crim. Proc., art. 578. Defendant offered no proof to sustain this cause or ground set up in his motion. The courts are not permitted to go outside the statute in search of reasons for changing venue when the motion is made for that purpose. In so far as the combination on the part of the lodge was concerned the evidence disproves it.

The facts adduced upon the trial of the cause, if we consider same from the standpoint of the verdict, strengthens the conclusion that there was neither prejudice nor combination against the defendant. If the State's theory and testimony were correct, the killing was murder, and not manslaughter.

About a week before the killing Mrs. Lacy testified that she had promised an assignation with the deceased, to be consummated on the day of the killing at the place of the homicide. On Monday morning preceding the killing, about four days after the agreement between his wife and deceased was entered into, the defendant went to the town of Burnet. While there he secured a gun, and was heard to remark, "I am getting tired of this; I have stood it as long as I can." On Tuesday he returned, and on Wednesday he went to the place of assignation with his gun procured in Burnet and secreted himself from view, and as deceased was riding along the fence, shot and killed him. He at once went to his nephew, George Whitman, and informed him that he had killed the deceased because he had been attempting to seduce his wife, and had been for two or three years.

The above illustrates the theory of the State that the homicide was upon malice. To meet this the defendant put his wife on the stand, and by her proved that deceased had been attempting her seduction for some time; that about two weeks before the homicide she had consented to an assignation with deceased, but did not fulfill it. That deceased upbraided her for such failure, and that she again consented to an assignation with deceased to occur at the time and place of the homicide. This she did not communicate to her husband until the morning preceding the killing in the evening. Acting upon this, defendant armed himself and went to the place of assignation, secreted himself, and when deceased came near to him he shot and killed him. The State's theory was murder, while defendant's was manslaughter based upon the insulting conduct toward his wife and the attempts at her seduction. The jury accepted this theory and convicted him of the offense of manslaughter. If, then, the verdict is looked to, we find that it strongly indicates that there was neither prejudice nor a combination formed against appellant.

From any angle of view, we do not see that error was committed by the court in refusing to change the venue. The granting or refusing

the application rested in the sound discretion of the trial court, and on appeal the action of said court upon such application will not be revised unless it should appear that said discretion has been abused. Martin v. The State, 21 Texas Ct. App., 10; Pierson v. The State, 21 Texas Ct. App., 14; Scott v. The State, 23 Texas Ct. App., 521; Meuly v. The State, 26 Texas Ct. App., 274.

A special instruction was requested submitting the law of insanity to the jury, but it was refused. We do not understand from the facts that the question of insanity is in this case. Mrs. Lacy's evidence is the only evidence that it is contended tends to raise that issue. She testified, that "On the day of the killing and before the killing I told my husband of my troubles. He then seemed nearly crazy. I told him of the place, and went part of the way and showed him. He was restless all day. I told him the hour of meeting was about 4 o'clock. Prior to the hour of meeting I went in the other direction with my children. The day I told defendant he was restless and moved about uneasily. I never saw him act so before, and we lived together a long time. Generally when at home he would read or play with the children. That day he was silent; did not read nor notice the children. At dinner he ate nothing but a mouthful or so. After dinner my husband was sitting on the porch with his children. I don't know how long he sat there." He left the porch about 3 p. m., got his gun, went off to the place of the homicide, sat in ambuscade for about one and a half hours until deceased rode up, when he shot and killed him.

This testimony was offered for the purpose of showing "passion" produced by the "adequate cause" in order to reduce the homicide from murder to manslaughter. This evidence does not raise nor suggest the theory of insanity. Weigh it as strongly as possible as an exciting cause to the mind, it does not present any theory which could be held to raise the question of insanity, or a theory which a reasonable mind could entertain as remotely calculated to destroy the State's case when considered in connection with the other testimony in the case, or that would produce the conclusion that defendant was irrational or was in a condition not to know right from wrong. This evidence does not show that the defendant did not know the nature and consequences of his acts or what he was doing, and that it was wrong.

We fail to find the slightest evidence of insanity on the part of defendant. On the contrary, every act of his indicated fully that he was conscious of what he was doing and going to do, and fully prepared himself for the execution of his plans and executed them with his characteristic and usual intelligence. The court did not err in refusing the special instructions asked.

The motion for continuance was properly overruled. The evidence set out therein as expected to be proved was neither material nor probably true.

Finding the errors assigned not well taken, the judgment is in all things affirmed.

*Affirmed.*

Judges all present and concurring. '

I agree to this opinion, because the resolutions were not embraced in the bill of exceptions reserved to the action of the court in overruling the motion to change the venue.

J. M. HURT, Judge.