# FLOENCE L. MURPHY, *alias* FLORENCE L. MURPHY, *alias* HENRY JOHNSON V. THE STATE.

No. 20861. Delivered May 15, 1940.
Rehearing Denied June 26, 1940.

The opinion states the case.

*W. H. Barnes* and *Morris Brin,* both of Terrell, and *Ross Hüffmaster,* of Kaufman, for appellant.

*Fred V. Meredith,* Assistant County Attorney, of Terrell, *Fred T. Porter,* County Attorney, and *Carlisle & Henry,* all of Kaufman, and *Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, Judge.

The offense is rape; the punishment, death.

Appellant is a negro; prosecutrix, Mrs. Sally Cauthen, a white woman. Prosecutrix and her husband lived on a farm in the vicinity of Terrell, Texas. On the 9th day of August, 1939, she started to a neighbor's house. After walking down the road about a quarter of a mile she met the appellant. Immediately after she passed him he grabbed her by the arm and threatened to kill her if she refused to go with him. He had an open knife in his hand. She endeavored to free herself from the appellant and struck him on the arm in an effort to knock the knife out of his hand. She hollered for help twice, and appel-

lant grabbed her by the throat, again telling her he would kill her. Choking her, he dragged her into a cane patch and threw her down. She was exhausted and unable to move. Appellant had an act of sexual intercouse with her, after which he stabbed her twice with his knife. She had fought him to her utmost but was unable to prevent the outrage. She positively identified appellant as her assailant. The foregoing is, in brief, the testimony prosecutrix gave upon the trial.

Appellant's testimony raised the issue of alibi. He introduced witnesses who supported his testimony.

The State introduced witnesses whose testimony warranted the conclusion that appellant's defense of alibi was fabricated.

The evidence is sufficient to support the judgment of conviction.

Appellant is a negro. When the case was called for trial he made a motion to set aside the indictment on the alleged ground that the negro race had been discriminated against in the selection of the grand jury. The court heard the testimony of several witnesses.

A deputy sheriff who had held office in Kaufman County for twenty years, testified on his direct-examination by appellant's counsel that during all the time he had held office he had never seen any member of the colored race on the grand jury of the county. He said: "I don't remember of any member of the colored race being subpoenaed to serve on the grand jury, and never heard of it." On cross-examination he testified: "I am not testifying that negroes have never been selected from among those from which the grand jury was actually drawn."

The county clerk testified on direct-examination by appellant's counsel that he had been around the courthouse for about twenty-six years, and had never known of any member of the colored race serving on the grand jury of the county. He did not know how many negroes lived in the county. Moreover, he said: "There are quite a good many taxpaying members of the negro race in the county. According to the law, I would think there are negroes in this county who are qualified to render jury service, a good many of them." On cross-examination the witness testified: "I am not testifying to the fact that negroes have not been selected to come here from which the grand jury would be drawn." He testified, further, that he had not examined the tax rolls and the poll tax list in order to determine how many negroes had paid their poll

taxes. (The indictment was returned at the June term, 1939.) Again, he testified: "As a matter of fact I do not know whether there was any qualified negroes for grand jury service in Kaufman County for this year (1939)."

A former district judge who lived in Kaufman County in 1938 testified on direct-examination by counsel for appellant that he had served as district judge from 1917 until 1934; that during the time he sat as district judge no members of the colored race served on the grand jury; that he was unable to say whether there were negroes in Kaufman County during that period of time who were qualified to serve on grand juries; that at one time he worked in the tax collector's office and learned while there that there were poll-tax payers and property-tax payers among the negroes; that a great many negroes were "heads of families." On cross-examination the witness testified that during his 18 years of service upon the bench negroes had been summoned as petit jurors; that he did not know that any had served on the jury. At this juncture we quote from the testimony of the witness, as follows: "I am not testifying, so far as I know, that there is a single negro in Kaufman County that is qualified as a grand juror. I couldn't testify that there are any. As long as I was district judge here I did not give instructions to any jury commission each term of the court that selected the grand jurors and the petit jurors for the next term—I never officially instructed that commission not to select any members of the colored race to serve on the grand jury or petit jury. There never was any instructions of that kind given to the jury commission of this county as long as I was district judge."

Upon redirect-examination the witness testified that he only recalled three or four instances in which negroes had been summoned to serve on the petit jury; that these negroes had the same initials as white men that he had known in the same locality. He said: "None of these three or four negroes during those years served on the petit jury. They were excused from the panel before the panel was ever questioned for jury service. No negro ever served on the jury commission." On recross-examination the witness testified as follows: "Those negroes who were excused from the petit jury, their names were called in the usual manner, and they would usually arise when I would ask for excuses, they would ask to be excused, which I would gladly do."

The trial judge testified that he had been practicing law in Kaufman County since 1910, and had served as district

judge for a little more than four years; that he was county attorney from 1916 to 1920; that he had never known any member of the negro race to serve on the grand jury; that he did not know whether negroes had been called to serve on the grand jury. We quote in part from the testimony of the witness as follows: "I have known of negroes on several occasions being called here either on the grand jury, the sixteen that are called for grand jury service, or on the petit jury, I don't remember which just now. Some have been called on the grand jury or petit jury and been excused; I don't remember which. I do remember that on several occasions that negroes have been in the court room for jury service. As to whether any of them ever served on the jury, my recollection is that when excuses were called for, the court would always excuse them."

On cross-examination by the State the witness testified that he did not instruct the jury commissioners not to select any negroes for grand jury service. He testified further: "I have always told the jury commissioners to select grand jurors, petit jurors and veniremen who were qualified voters and given them the general instructions as to what a qualified voter was under the law, always telling the jury commission to select the very best men in the county that they could find for grand jury service and for petit jury service, as well as on the venires, and that is the instruction I gave this jury commission that selected this grand jury for the June term, 1939." On redirect-examination the witness testified that he did not appoint a member of the colored race on the jury commission. Again, we quote from the testimony of the witness: "I was practicing law and was county attorney when Judge Hawkins was judge. I never did know of him appointing any member of the colored race on the jury commission. You ask me about the statement I made awhile ago about my instructing the jury commission to get the best citizens, and then you ask if the 'best citizens' aren't the white citizens. I don't think there is any question about that."

On recross-examination the witness said: "That is a matter of opinion that I left to the individual opinion of the jury commission."

The tax collector of the county was called to the stand by appellant. According to his testimony, he was county auditor from 1917 to 1934. During the time he had been around the courthouse he had never observed any member of the colored race serving on the grand jury. He kept the tax rolls showing the number of qualified voters in the county paying poll taxes

and taxes on property. He testified that for the year 1938 there were 3,317 poll taxes paid. There were 45 in the county who were exempt from the payment of a poll tax. He said: "I think there is about 50 colored poll taxes, approximately that number. This is for last year, 1938. I have it for 1937. I am sure that the 1929 records are down there. It would take about an hour to get a list of those white tax payers and colored tax payers for ten years back." On cross-examination the witness testified: "There is a number of the approximately fifty negro poll-tax payers that are women. I made a list of the colored voters of this county, the negro voters of this county who have paid their poll taxes. The paper that you have there is the list that I made for you, which shows about 25 on there that I know are women. That is approximately 50 per cent of the negro voters of this county that are women, who, of course, are disqualified for grand jury service. Of the men who are on that list there are three school teachers, that I know of, and one preacher, who, of course, are exempt from jury service. There are a good many on there that I don't know. That would leave, then, approximately twenty that might be qualified out of 3,350 qualified voters of the county. I have been in this county fifty eight years, and have never been called as a grand juror in this county and I have always paid my poll tax every year."

The witness testified that he had been exempt from service as a juror practically all of that time. At this juncture we quote further from his testimony, as follows:

"I have here the poll-tax figures for the last ten years that you asked me about. In 1929 there were 5,256 whites and 197 colored. In 1930, there were 3,350 whites and 61 colored. In 1931, 4,284 whites and 61 colored. In 1932, 2,584 whites and 83 colored. In 1933, 4,975 whites and 74 colored. 1934, 3,484 whites and 55 colored. 1935, 5,485 whites and 103 colored. 1936, 3,420 whites and 62 colored. In 1937, 5,435 whites and 102 colored. I believe I testified as to '38 this morning.

"Those figures I have testified about for the negro voters doesn't mean that they were all negro men. That is all of the colored men and women who qualified. During that time that I have been in office, it was about 50-50, approximately as many negro women paid their poll tax as men; I didn't take the other figures. That same thing doesn't apply to the white people, those numbers I gave for all those years. There is less women that paid poll taxes than men. That same rule doesn't apply to the negroes, for the reason that the negro rarely ever pays

his poll tax unless he has real property rendered and they are required to under the law if they have real property rendered."

The State called one of the jury commissioners, whose testimony we quote, as follows: "In selecting the grand jurors for the June Term (1939) there was no reference or mention by any one of us at any time with reference to whether the person selected was white or black. There was no expression by any of us at any time that we wouldn't put a negro on the grand jury or on the petit jury of this county. We went at it in a systematic manner and tried to select—in other words, we tried to carry out the Judge's precautions as to selecting good men for the jury, but the fact as to whether they were colored or white was not mentioned at any time while we were in session. To aid and assist us in drawing and making up our grand jury and petit jury list, we had a list of the qualified voters, just a usual list, you know, and we had a list of the ones who had served on the previous term, that we had to check to be careful not to use the same men over again. We selected sixteen men for grand-jury service, and in our selection of those sixteen men, we were not guided by their color or race in any way. We did not designedly and purposely omit from the grand jury selection persons of the negro race. To aid us in the selection of the grand jury, as well as the petit juries, we had the poll-tax list of Kaufman County for 1938. You ask me if I had drawn out some negro's name that I knew was there while drawing for the grand jury, whether I would have left him on there. I will answer that question in this way: That I know some negroes that I have got in my mind that would be all right on the grand jury. In other words, I am not prejudiced against the colored race, you understand, but in this particular case, we didn't discuss it pro and con. It just didn't happen to come up. We just didn't discuss it either way; the question didn't come up. I presume the reason it wasn't necessary to discuss them was that we didn't draw them. I don't recall that I ever saw any negroes on the jury here in this county. However, I haven't been around the courthouse much. We selected a special venire list too."

The federal census for 1930 showed that Kaufman County had a population of 40,905, consisting of 27,274 whites and that 11,511 were negroes.

Art. 339, C. C. P., reads as follows:

"No person shall be selected or serve as a grand juror who does not possess the following qualifications:

"1. He must be a citizen of the State, and of the county in which he is to serve, and qualified under the Constitution and laws to vote in said county; but, whenever it shall be made to appear to the court that the requisite number of jurors who have paid their poll taxes can not be found within the county, the court shall not regard the payment of poll taxes as a qualification for service as a juror.

"2. He must be a freeholder within the State, or a householder within the county.

"3. He must be of sound mind and good moral character.

"4. He must be able to read and write.

"5. He must not have been convicted of any felony.

"6. He must not be under indictment or other legal accusation for theft or of any felony."

The women poll-tax payers were not eligible for grand-jury service. According to the testimony we have detailed, omitting those exempt from service, there were approximately twenty negro men who had paid their poll taxes. It was not shown that any of these twenty were qualified, under Art. 339, supra, for service on the grand jury. In short, it was not shown that any one of them could read and write. Nor was it shown that they were householders in the county or freeholders in the state, unless it can be said that the statement of the tax collector that negroes rarely ever paid their poll taxes unless they had real property is sufficient to warrant the conclusion that the twenty negroes who had paid their poll taxes were freeholders in the state. We think the broad statement of the witness should not be held by us sufficient to show that they were freeholders. There is no proof in the record that they were householders. There is nothing to show that they were not available as witnesses. It would appear that if they were qualified to serve on the grand juries appellant could have established that fact. In short, the testimony fails to show how many of the negro poll-tax payers were qualified for grand jury service. The case of Ryan v. State, 123 S. W. (2d) 659, presents a somewhat similar situation. In that case it was insisted that the indictment should be set aside on the alleged ground that the negro race had been discriminated against in the selection of the grand jury which returned the indictment. In affirming the judgment, this court reached the conclusion that Ryan had failed to sustain his contention that discrimination had been

practiced. After the motion for rehearing had been overruled Ryan filed in the Supreme Court of the United States a petition for writ of certiorari, which was denied. See Walter Ryan v. The State of Texas, 83 L. ed. 1493. We quote from the opinion of the Court of Criminal Appeals in Ryan's Case as follows: "The two bills of exception found in the record relate to the appellant's efforts to have the indictment set aside on the alleged ground that the negro race had been discriminated against in the selection of the grand jury which returned the indictment. The court heard the testimony of three witnesses, two of whom stated that there were more negroes in the county than white people and that for approximately twenty-five years no negro had been selected for service on a grand jury. It was not shown how many negroes paid poll taxes, nor how many were women, nor how many could read and write, nor how many were householders in the county or freeholders in the state. In short, the testimony fails to show how many of the negro poll tax payers were qualified for grand jury service. It is true that a witness for appellant testified on his direct-examination that there were as many qualified voters and people for jury service among the negroes as there were whites. However, on his cross-examination he said: 'I do not know how many negroes during the year 1937 paid their poll tax. I know a good many of them did so. I could not say how many negroes paid a poll tax in 1937. All I could say is that I know that some of them paid. I would not say a very, very small percent of negroes paid a poll tax. It is not a fact that there is a very small percentage of the negro race whose names are on the tax rolls of this county. They are on the tax rolls. I do not know what percentage of the negro population is on the tax roll. I judge all of them, pretty well all of them; the same percent as the white people. I think the percentage among the negroes would be the same as among the white people whose names appear on the tax rolls. Of course, I could not know without examining the records.' It is manifest from the testimony of this witness that he was merely expressing his opinion that there were negro poll tax payers who were qualified for grand jury service. He expressly stated that he would not know such to be the fact without examining the records. The jury commissioners were not called by appellant in an effort to support his claim that there had been an intentional discrimination against the negroes because of their race or color. Hence it appears that the claim of discrimination was based largely on the fact that for many years in San Jacinto County no negroes had been drawn or served on grand juries.

That fact alone would not show an intentional discrimination against them because of their race or color. Ross v. State, Tex. Cr. App., 7 S. W. (2d) 1078. The third witness merely gave testimony that the school census showed that there were more negroes than whites in the schools of San Jacinto County. It is our conclusion that the evidence fails to show that the omission to draw any negroes upon the grand jury which indicted appellant was the result of purposeful discrimination against the negroes because of their race or color. Hence appellant's complaint can not be sustained. Ross v. State, supra."

It is our conclusion in the present case that the evidence fails to show that the omission to draw any negroes upon the grand jury was the result of purposeful discrimination against the negroes because of their race or color.

It is also appellant's contention that his motion to quash the venire should be sustained upon the alleged ground that the negro race had been discriminated against in the selection of the jurors composing the special venire. Having overruled appellant's contention that the jury commission practiced discrimination in selecting the grand jury, and the proof being the same on the question of discrimination in selecting the jurors who composed the venire, it is unnecessary to discuss the question further than to say that, in our opinion, the evidence fails to show that the omission to draw negroes for jury service was the result of purposeful discrimination against negroes because of their race or color.

Appellant moved for a change of venue, making affidavit thereto and supporting same by the affidavits of two compurgators, as is the requirement of Art. 562, C. C. P.; the only ground laid being that there existed against him in Kaufman County so great a prejudice as that he could not obtain a fair and impartial trial. In its traverse of the motion the state questioned the means of knowledge of appellant's compurgators, and denied the existence of prejudice.

Appellant introduced excerpts from newspapers and also the testimony of witnesses who were connected with such newspapers to show the circulation of the papers in Kaufman County. The first witness was connected with the Dallas News. He testified that all he knew about the circulation in Kaufman County of the Dallas News was that some of the papers came into the county. He did not know what sections of the county these papers reached. In response to a question by appellant's counsel, the witness stated that he had come to Kaufman

County after he had learned that the offense had been committed, and talked to the county attorney. He denied that that official made any statement to him concerning the intensity of the feeling of the people. He said: "I didn't quote Mr. Porter (referring to the county attorney) with reference to any mob violence or high feeling. I think the quotation as to the crowd in the man hunt is correct." The witness testified that he was in Kaufman County in the City of Terrell four or five hours, and that he heard nothing that gave any evidence that appellant could not get a fair and impartial trial in said county. He stated that he did not hear any expression of antagonism against the appellant. However, he said that there were a good many officers and rangers in the county at the time making an effort to apprehend the appellant. We quote from his testimony: "They had bloodhounds there when I was there. I went with the posse when they went to look for the guilty party. I heard no shots fired."

The next witness introduced by the appellant was the general manager of the Daily Tribune of Terrell. He testified that his paper had a paid circulation in Kaufman County of 2,997, and a "free distribution" of 138. Further, he testified that the paper went into every precinct and voting box in the county. Continuing his testimony upon his direct-examination, he said: "I have heard a lot of resentment against this negro." However, it was the version of the witness that he had heard nothing about "any mob violence." At this juncture we quote from his testimony as follows: "There has been some talk and bitter feeling about this, and there is now. I don't know whether there is talk and bitter feeling all over the county or not. I haven't been all over the county. There is a good deal of talk concerning the case wherever I have been." On his cross-examination the witness testified that he had not heard any "prejudgment or bias over the entire county, or prejudice" against the appellant. He said: "I do not know of any reason from what I have heard talked why this negro, Florence L. Murphy, couldn't get a fair and impartial trial in Kaufman County." The witness was called upon by counsel for appellant to estimate the crowd in the courtroom. He stated that in his opinion there were six hundred in the courtroom and "a good many downstairs and outside downstairs." He also testified that he heard some of the people knocking on the doors and had observed officers guarding the doors. His testimony was to the further effect that there were a good many officers in the courtroom.

The editor of the Kemp News, another paper in Kaufman County, was introduced by appellant. He testified that his paper had a circulation of about 800 in the county. He was of opinion that appellant could obtain a fair and impartial trial in Kaufman County. He said: "I have not heard any great amount of talk and expressions of sentiment and prejudice against this particular negro."

The editor of the Mabank Banner, a paper published in the county, testified that the total circulation of his paper in Kaufman County was about 375. Upon his cross-examination the witness expressed the opinion from what he had heard that appellant could obtain a fair and impartial trial in the County.

The publisher of the Kaufman Herald, which was a weekly paper, testified that the circulation was about 2,500. His paper reached all portions of the county. On cross-examination he said: "I don't know of any reason from what I have heard and talked to people and read why this Florence Murphy could not get a fair and impartial trial in Kaufman County."

The sheriff of the county was introduced as a witness by the appellant.. He testified that, although a large crowd had assembled after the offense had been committed, he heard no expressions showing public resentment and bitter feeling against the negro who had perpetrated the crime. In short, it was his version that there was nothing indicating mob spirit. He admitted that, as a precautionary matter, he and several other officers carried the appellant to Dallas and placed him in jail. In going to Dallas from Kaufman appellant was carried by Tyler and not through Terrell, which was near the scene of the alleged offense. The sheriff also testified that there were a number of officers present who were helping him guard the appellant. At this juncture we quote from his testimony, as follows: "Since this matter occurred over there near Terrell on Monday night I have been in and around over the county. I have not heard any expressions from over the county that indicates or leads me to believe that this negro could not get a fair and impartial trial in this county. I haven't heard anything like that."

Appellant failed to introduce his compurgators.

The state introduced several witnesses who testified to the effect that they had never heard any expression of opinion with reference to mob spirit against the appellant. One witness for the state testified that if he were basing his conclusion upon what he had read in the papers he "would have to say"

that appellant was guilty. Some of the witnesses for the state gave testimony indicating that appellant's compurgators had not gone over the county after the commission of the offense in an effort to determine the sentiment of the people.

In rebuttal, appellant introduced a witness who testified that shortly after the rape he had heard a number of people talking around Terrell about mobbing the appellant. This witness, however, was unable to remember the names of any people who had suggested mob violence.

Appellant introduced the grand jury report, which, in part, thanked the officers for the efforts put forth in apprehending the appellant.

The articles from the newspapers in the main seem to present statements "reasonably in consonance with the facts of the case" as developed on the trial, and do not appear to be colored to the extent that they might "reasonably create feeling or resentment more than would arise in the breast of any citizen hearing such facts related." Manifestly, there was an issue as to the existence of prejudice. Our examination of the newspaper articles leads us to the conclusion that they are not adequate to support the inference of prejudice necessary to secure a change of venue. We quote from Parker v. State, 238 S. W. 943, as follows: "We gather that the evidence of prejudice, upon which the appellant relies, is traceable to the alleged consequences of newspaper publications. Those set out in the document to which we have referred appear to be such only as might come within the scope of the proper functions of a newspaper, in informing the public of current events. Such publications alone have not, within our knowledge, been held adequate to support the inference of prejudice necessary to secure a change of venue. Cox v. State, supra; Ruling Case Law, vol. 27, p. 818, sec. 36. Our statute upon the selection of individual jurors recognizes that even opinions formed from reading newspaper accounts may not disqualify the juror from sitting in a particular case. Code of Crim. Proc., art. 692, subd. 13; Grissom v. State, 4 Tex. App., 374; Rothschild v. State, 7 Tex. App. 519; McKinney v. State, 31 Tex. Cr. R. 583, 21 S. W. 683; Ashton v. State, 31 Tex. Cr. R. 479, 21 S. W. 47; Groszehmigem v. State, 57 Tex. Cr. R. 241, 121 S. W. 1113; Maxey v. State, 66 Tex. Cr. R. 234, 145 S. W. 952; Myers v. State, 71 Tex. Cr. R. 594, 160 S. W. 679; Myers v. State, 77 Tex. Cr. R. 239, 177 S. W. 1167. It is not to be expected that the men of intelligence from whom our juries are drawn and

whose judgment is potent in forming public opinion will not inform themselves of the events of the day as they are reflected in the press, nor that they will generally form from such reports an opinion so fixed as to render them incapable of forming an impartial judgment from hearing the evidence revealed by the witnesses, under oath, in a given case."

See also Willis v. State, 81 S. W. (2d) 693.

The burden was upon appellant to support by evidence the averments in his motion for a change of venue. Parker v. State, supra. It was the duty of the trial judge to try the issue raised by the testimony. We would not be warranted in overturning his judicial discretion unless it is clearly made to appear that such discretion has been abused. Lacy v. State, 16 S. W. 761. We quote from Carlisle v. State, 255 S. W. 990, as follows: "The statute fixes the measure of the court's duty upon an application for a change of venue, namely, to grant the motion where, upon the uncontroverted motion or upon the evidence adduced, it is made to appear that there exists in the county 'so great a prejudice against (the appellant) that he cannot obtain a fair and impartial trial.' Code of Crim. Proc. Art. 628. The burden is upon the appellant to prove the existence of such prejudice, and, where evidence is heard, the issue is to be determined by the trial court. The discretion is upon the trial court to weigh the evidence, and, if from it there arises two conflicting theories, the trial court has the discretion to adopt either. In the absence of the abuse of this discretion, the judgment will not be disturbed on appeal. If, however, the evidence is such that it leads to the conclusion that the bias, prejudice, or prejudgment of appellant or his case is such as renders it improbable that a fair and impartial trial can be given him, the trial court is without discretion to refuse the application. Dobbs v. State, 51 Tex. Cr. R. (629) 632, 103 S. W. 918. Injury is shown when it is made evident that under the procedure provided by law it is improbable that an impartial jury can be impaneled to determine the guilt of the accused, and a change of venue is denied. Barnes v. State, (42 Tex. Cr. R. 297) 59 S. W. (882) 883, (96 Am. St. Rep. 801); Randle v. State, 34 Tex. Cr. R. (43) 59, 28 S. W. 953; Cox v. State, 90 Tex. Cr. R. 106, 234 S. W. 72, and cases cited."

See also Walker v. State, 60 S. W. (2d) 455.

From a review of all the evidence relating to the motion for change of venue, we find nothing which leads to the conclusion that the trial judge abused the discretion vested in

him to determine the matter. We are therefore constrained to hold that the motion was properly overruled.

Bill of exception No. 4 is concerned with appellant's motion for a continuance. The application was based upon the ground that there was such prejudice and high feeling against the appellant that he could not obtain a fair and impartial trial. The court qualified the bill of exception as follows: "Upon the hearing of defendant's motion for continuance as complained of in this bill of exception 12 witnesses, residents of Kaufman County, were called by both the state and the defendant, of whom 11 testified that there was no prejudice against the appellant in their respective communities, and that, in their opinion, the defendant could receive a fair and impartial trial in Kaufman County, and the twelfth was not asked about either of these matters. It was upon this testimony, which was all of the testimony offered upon said motion, that the court overruled defendant's motion for a continuance." We think the bill of exception fails to reflect error. The trial court was warranted in concluding from the testimony heard that appellant could obtain a fair and impartial trial. The trial court was warranted, in the first place, in overruling appellant's application for a change of venue. It follows that there was no abuse of discretion in denying the continuance.

Bill of exception No. 6 relates to argument of the assistant county attorney to the effect that the sheriff and his deputies and the other officers believed that they had "the right man." The court qualified the bill of exception as follows:

"While the statement was being made, two of the attorneys for the defendant, Mr. Morris Brin and Mr. Jack Bond, arose from their seats, and one or the other came around to the Court's bench and stated in a whisper or undertone, that they objected to the argument made, and at this juncture the full statement had been completed. No request was made by the attorneys for the defendant that the Court instruct the jury not to regard the statements so made. Mr. Barnes, who made the closing argument in behalf of the defendant, made the same kind and character of speech to the jury, stating 'Gentlemen, I wish I knew whether this defendant is guilty or not. We—' referring to co-counsel'—have spent days talking to witnesses in Dallas and in other parts of the country, talking to the defendant, spending our own money, traveling in our own automobiles trying to make up our minds whether this defendant is guilty. I don't know now, but I wish I did. From

the evidence in this case he is probably guilty, but there is a possibility that he is not.'

"The statement so made by the Assistant County Attorney was based upon the testimony introduced upon the trial, and is a reasonable deduction therefrom, and in no manner prejudiced or affected the rights of the defendant herein."

Appellant did not except to the qualification, and we must therefore appraise the bill in the light of the qualification. The qualification not only shows that the argument was invited, but recites that it was based upon testimony introduced upon the trial, and was a reasonable deduction from such testimony. Under the circumstances, we would not be warranted in holding that the bill of exception reflects reversible error.

Bill of exception No. 7 recites that on his voir dire examination Venireman Watkins testified that he had read the headlines of the newspapers relative to the rape of the prosecutrix; that from reading such headlines he formed no opinion that appellant was the guilty party; that he probably formed the opinion that the crime of rape had been committed; that he had not heard many people discuss the case; that after appellant had been apprehended he had heard some people say that the officers "got the right negro"; that he would allow appellant to prove that he was not the guilty party, but that he did not know whether he would require him to or not. Appellant's peremptory challenges had been exhausted, and he interposed a challenge for cause, which was overruled. In qualifying the bill of exception, the court stated that Mr. Watkins did not testify that he would require defendant to offer proof that he was not the guilty party. The qualification also states that the juror testified that he had formed no opinion as to the guilt or innocence of appellant, and at that time entertained no opinion as to whether he was guilty or innocent. It is further stated in the qualification that the juror testified that he would require the state to prove the defendant guilty beyond a reasonable doubt and would go into the jury box presuming him innocent and would presume him innocent until proven guilty. We think it is manifest from the qualification that the court was warranted in overruling the challenge, as it cannot be said that the juror was of fixed opinion that appellant was guilty.

We think bill of exception No. 8, as qualified, fails to reflect error. It is true that appellant was required to testify that he had been convicted of a felony in 1929. It might be that the former conviction would be held too remote if it were not for the fact that it is shown in the qualification appended

to the bill of exception that appellant's counsel elicited from appellant the fact that he had been convicted in Rusk County of the offense of assault with intent to rape in 1932 and assessed a punishment of twenty years confinement in the penitentiary. In Anderson v. State, 21 S. W. (2d) 499, it is shown that on cross-examination the state elicited from Anderson that he had been indicted for murder more than twenty years before the present trial and that he had been tried in a federal court on a charge of peonage twelve years before the present trial. Proof of the conviction and charges mentioned was objected to on the ground that the transactions were too remote. We sustained the action of the trial court in permitting such proof, and cited Shipp v. State, 283 S. W. 520, in support of our conclusion that error was not presented. In Shipp's Case, in discussing the question as to whether testimony of the character now under consideration is too remote to warrant its being received in evidence, this court said: "At what period of time testimony of a prosecution for an act of the accused which is discrediting to his veracity becomes too remote to warrant its receipt in evidence seems to the writer one that cannot be arbitrarily determined by the courts. Entering into the relevancy of such testimony, there would seem to be many circumstances. For example, the period of the life of the accused at which the discrediting act took place and his subsequent conduct are elements that must be taken into account. Supposing the accused to be a youth, indiscretion amounting to a criminal offense committed by him ten years previous at a time when he was a mere child of tender years would seem, in the absence of supporting testimony showing prosecutions indicating continued evil disposition, to be too remote. Supposing the accused to be of middle age or more, and the discrediting fact to have taken place ten years or more antecedent to the time the proof of it was offered in evidence, his freedom from accusations of crime during the intervening space of time would seem of weight upon the relevancy of the proof. In the due administration of justice, the idea of reform—the fact that an individual once bad may have amended his ways—is not to be ignored by the courts. One may have been bad and become good, or may have borne an excellent character and a good réputation at no distant time and had become profligate and criminal in his tendencies. This court has oftentimes been called upon to consider, and has considered, the admissibility of testimony to the effect that the accused had been charged with an offense at some time previous to that for which he was on trial, but it has never, so far as the writer is aware,

undertaken to fix arbitrarily and absolutely a space of time which would characterize such testimony as too remote. In the opinion of the writer, the nature of things precludes such a declaration. The receipt of such testimony should primarily be determined by the trial judge after an investigation, in the absence of the jury, to learn whether, under the ascertainable facts, the act is too remote. The exercise of such discretion is subject to review, and, in case of abuse, to be revised."

Making application of the holding in Shipp's Case, we are constrained to overrule appellant's contention that the bill of exception presents reversible error. See also Oates v. State, 149 S. W. 1194; Stratton v. State, 8 S. W. (2d) 171; Fritts v. State, 42 S. W. (2d) 609.

It is shown in bill of exception No. 9 that in argument the county attorney stated that after the commission of the rape prosecutrix was lying on the ground in her own blood. The qualification to the bill of exception is to the effect that appellant stabbed the prosecutrix and that blood flowed from her wounds while she was lying on the ground. As qualified, the bill fails to show error.

Bill of exception No. 11 recites that appellant challenged the venireman Huddleston for cause after he had testified upon his voir dire examination to the effect that after the rape there appeared to be some resentment and feeling against appellant. The bill recites that the juror said that he had heard the case discussed by people who thought that appellant had been positively identified as the assailant of the prosecutrix. The bill recites further that the court overruled the challenge and that appellant's peremptory challenges had been exhausted. In his qualification to the bill the court sets forth at some length the testimony of the juror on his voir dire examination. In short, the qualification shows that the juror had formed no opinion as to the guilt or innocence of appellant, and, further, that he would require the state to prove his guilt beyond a reasonable doubt before he would find him guilty. No error is reflected.

Bill of exception No. 12 is also concerned with the action of the trial court in overruling a challenge for cause to a venireman. This bill, as qualified, is in the same attitude as the foregoing bill.

Bill of exception No. 13 shows that after the court had overruled a challenge for cause to a venireman appellant exercised a peremptory challenge. The qualification to the bill shows

that appellant used his fifth peremptory challenge in standing the juror aside, leaving appellant ten peremptory challenges. We find nothing in the bill of exception showing that appellant was forced to take an objectionable juror after his peremptory challenges had been exhausted. This court has uniformly held that where the court erroneously fails to sustain a proper challenge of a juror for cause, a reversal will not result unless it is made to appear that the error brought injury to the accused. Injury will not be inferred where it is made to appear that the challenged juror was excused by the accused upon a peremptory challenge. It must appear from the bill that all of the peremptory challenges of the accused were exhausted, and that thereafter there was placed upon the jury an objectionable juror. Johnson v. State, 1 S. W. (2d) 896. It is also held that by the term "objectionable juror" is not meant that the juror is subject to challenge for cause, but that his examination must show some degree of disqualification, such, for example, as the formation of some character of opinion as to the guilt or innocence of the accused. Johnson v. State, supra. It is essential that the bill of exception relating to the matter be so framed as to bring before this court knowledge of the facts from which it is claimed that a juror forced upon the accused is objectionable. Johnson v. state, supra. The bill in the present case fails to show that any objectionable juror sat in the trial of the case. Hence it fails to reflect reversible error.

Bill of exception No. 15 relates to the action of the court in overruling appellant's challenge for cause to a venireman. It is recited in the bill that on his voir dire examination the juror testified that he had formed the opinion that the officers, in arresting the appellant, had gotten the right man. The court qualified the bill of exception to the effect that the juror testified from what he had heard and read he had formed no opinion that appellant was guilty. Further, the bill is qualified to show that the juror testified that he would require the state to prove appellant guilty beyond a reasonable doubt, and would presume that he was innocent until such proof was made. The court stated in the qualification: "From the entire examination of the venireman, which is only partly set out here and in the bill, the venireman showed himself to be unprejudiced, unbiased, and without any fixed opinion that would prejudice him in any way from sitting as a juror in the case, and showed that he should and would make a fair and impartial juror in the trial of the case." The qualification was not excepted to, and we are bound by it. As qualified, the bill of exception fails to reflect error.

A careful examination of all of appellant's contentions leads us to the conclusion that reversible error is not presented.

The judgment is affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

ON MOTION FOR REHEARING.

GRAVES, Judge.

Appellant again insists we were in error in our holding that his bill No. 1 evidences no error wherein we held that same did not show an intentional discrimination against the negro race in the selection of the persons who served on the grand jury that indicted this appellant for this alleged crime of rape.

We again note that under the testimony and the statute there were approximately twenty-five persons of the colored race who might have been qualified to sit on a grand jury in said county, and there is no other or further showing that such colored persons met the requisites of the statute as set forth in Art. 339, C. C. P. as follows:

"No person shall be selected or serve as a grand juror who does not possess the following qualifications:

"1. He must be a citizen of the State, and of the county in which he is to serve, and qualified under the Constitution and laws to vote in said county; but, whenever it shall be made to appear to the court that the requisite number of jurors who have paid their poll taxes can not be found within the county, the court shall not regard the payment of poll taxes as a qualification for service as a juror.

"2. He must be a freeholder within the State, or a householder within the county.

"3. He must be of sound mind and good moral character.

"4. He must be able to read and write.

"5. He must not have been convicted of any felony.

"6. He must not be under indictment or other legal accusation for theft or of any felony. (Id., p. 78, O. C. 289; Const., art. 16; sec. 19; Acts 1903, 1st C. S. p. 16.)"

Although there may have resided in this County of Kaufman about 11000 negroes, there were shown to be but about 50 who had paid their poll tax, and about one-half of these being women, not eligible to jury service, the eligibles from

the poll tax section alone of Art. 339, supra, fell to about 25. We do not find in the record any proof relative to Section 3 of article 339, nor of Section 4 of said article, nor of Section 5 thereof, nor do we find any proof relative to Section 6. In other words, no proof appears of the qualifications of any negro for grand jury service save that there are about 25 male negro freeholders within Kaufman County who paid their poll tax.

We do not think that a failure to find one of these upon a grand jury would evidence a discrimination against the colored race, especially in view of the testimony of the jury commissioners who selected the grand jury list, under the instructions of the court, and the law governing such matters.

It is insisted also that among these negro tax payers and freeholders would be found the names of negro doctors or physicians, as well as negro school teachers, but it is also observed that all doctors and physicians under our statute are exempt from jury duty.

That some one committed a crime in Kaufman County that would shock the conscience of any right minded citizen can not be denied. It is also patent that the peace officers, with full knowledge of what the probable effect of such a crime would have on any community, took all reasonable precautions to protect the person charged with such crime, and were present at all times for the purpose of guaranteeing to this unfortunate prisoner his full rights under the law of a public trial in the courts of the land. The careful district judge did all in his power to see that a fair trial was had, and brought to bear all the machinery of the law in order to protect appellant's rights. Appellant was placed in close proximity to the alleged crime by disinterested witnesses at about the time of its commission, and was positively identified by the victim, the mother of four children, who testified not only to her ravishment but also to the fact that her despoiler had twice stabbed her in the throat with a knife, and on appellant's knife there was afterwards found human blood.

Appellant offered an alibi, which was contradicted by members of his own race, and his eventual confusion in his testimony evidently went far to cause a reasonable mind to disbelieve his story.

The further matters herein complained of have been treated in our original opinion correctly, so we think, and we will not further discuss them.

We think the trial accorded appellant was a fair one and that which he was entitled to under the law, and we see no other alternative than to overrule this motion, which is accordingly done.